# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Thomas Condon,
    Petitioner

    vs.
                       Case No. 1:03cv897
                       (Weber, S.J.; Hogan, M.J.)

Jeffrey Wolfe,
    Respondent

## REPORT AND RECOMMENDATION

Petitioner, who was an inmate in state custody at the Noble Correctional Institution in Caldwell, Ohio when the instant action commenced,[1] has filed with the assistance of counsel a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the petition; respondent's return of writ and accompanying exhibits; petitioner's pleading in support of the petition;[2] petitioner's "Status Report" filed on April 7, 2006 in response to an informal request by court personnel; and the transcript of the state criminal trial proceedings. (Docs. 1, 4-6, 8, 17).

---

[1]In a Status Report filed with the Court on April 7, 2006, petitioner's counsel states that at this point in time petitioner has "completed serving his prison sentence as to all counts against him." (Doc. 17).

[2]The pleading is a summary judgment motion filed by petitioner, which was denied on November 23, 2004. (*See* Docs. 8, 11, 12). In denying the summary judgment motion, the Court adopted the undersigned's Report and Recommendation issued August 26, 2004, which provided that "the Court will consider the arguments asserted by petitioner's counsel in support of the summary judgment motion upon final adjudication of the merits of petitioner's claims for relief." (*See* Docs. 11, 12).

## Factual And Procedural Background

On February 12, 2001, a twenty-five count indictment was issued by the Hamilton County, Ohio grand jury charging petitioner and co-defendant Jonathon Tobias with twelve felony counts of gross abuse of a corpse in violation of Ohio Rev. Code § 2927.01(B) (Counts One, Three, Five, Seven, Nine, Eleven, Thirteen, Fifteen, Seventeen, Nineteen, Twenty-One, Twenty-Three); twelve misdemeanor counts of abuse of a corpse in violation of Ohio Rev. Code § 2927.01(A) (Counts Two, Four, Six, Eight, Ten, Twelve, Fourteen, Sixteen, Eighteen, Twenty, Twenty-Two,Twenty-Four); and one count of breaking and entering in violation of Ohio Rev. Code § 2911.13(A) (Count Twenty-Five).[3]  (Doc. 6, Ex. A).

With the assistance of counsel, petitioner filed a number of pretrial motions. He filed a motion to dismiss the "abuse and gross abuse of a corpse [charges] on the ground that Ohio's abuse of a corpse statute is unconstitutionally vague;" the motion was overruled on April 10, 2001. (*Id.,* Exs. B, D).  He also filed a motion to suppress evidence allegedly unconstitutionally obtained during an illegal search conducted at his place of business, which was overruled on May 7, 2001.  (*Id.,* Exs. E, L).  Finally, among other motions, he filed a motion to dismiss the charges against him "on the grounds that the alleged conduct is presumptively protected from criminal prosecution by the First and Fourteenth Amendments;" that motion was also overruled on May 7, 2001.  (*Id.,* Exs. I, L).

On October 2, 2001, during the trial proceedings, the trial court dismissed Counts Twenty-Five and Twenty-Six.  (*Id.,* Ex. M).  The court also apparently dismissed the misdemeanor abuse of corpse counts, and ordered that the remaining felony gross abuse of corpse counts be renumbered as Counts One through Twelve. (*See id.,* Ex. N). After a jury trial, petitioner was found guilty on eight of these twelve remaining charges (renumbered Counts Two, Five, Six, Seven, Nine, Ten, Eleven and Twelve).  (*Id.,* Ex. O).  On April 16, 2002, he was sentenced to terms of imprisonment totaling two and one-half (2 ½) years.  (*Id.*).

With the assistance of his trial counsel, petitioner filed a timely appeal to the

---

[3]Tobias was also charged in a Twenty-Sixth Count with theft in office in violation of Ohio Rev. Code § 2921.41(A)(1).  (Doc. 6, Ex. A).

2

Ohio Court of Appeals, First Appellate District, raising among other assignments of error the following claims: (1) the prosecutor engaged in misconduct, which deprived petitioner of a fair trial; (2) the trial court erred in failing to dismiss the charges on the ground that petitioner's conduct was protected by the First and Fourteenth Amendments; (3) the trial court erred in failing to dismiss the charges on the grounds that Ohio's abuse of a corpse statute is unconstitutionally vague and overbroad both on its face and as applied; (4) the trial court erred in failing to suppress evidence seized from petitioner's studio because the search warrant was unsupported by probable cause; (5) the trial court erred in instructing the jury; and (6) the trial court erred in sentencing petitioner to a 2 ½ year prison term.  (*Id.,* Ex. S).

On May 9, 2003, in a published decision, *State v. Condon,* 789 N.E.2d 696 (Ohio Ct. App. 2003), the Court of Appeals affirmed the trial court's judgment of conviction, but on finding that the trial court had erred in sentencing petitioner to more than the minimum prison term, reduced petitioner's prison sentence to eighteen (18) months.[4]  (*See also* Doc. 6, Ex. V).  In its opinion, the court made findings of fact, which are presumed correct under 28 U.S.C. § 2254(e)(1),[5] regarding the incident that resulted in petitioner's conviction:

### A. Prelude

In 1999, Ernest Waits, owner of Universal Media Consultants, and Condon, his associate and photographer, approached Terry Daly, office administrative assistant for the Hamilton County Coroner's office, concerning their interest in a video project explaining death to children. Waits also informed Daly about a project that Condon was separately interested in, a photographic essay called "life cycles" that sought to

---

[4]The Hamilton County Common Pleas Court issued a "modified" Judgment Entry on September 25, 2003, wherein petitioner was re-sentenced in accordance with the Ohio Court of Appeals' mandate to an aggregate prison term of eighteen (18) months.  (Doc. 6, Ex. NN).

[5]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence."  Petitioner has neither cited nor presented any evidence to rebut the Ohio court's factual findings quoted herein.  Therefore, petitioner has not demonstrated by clear and convincing evidence that such findings are erroneous.

capture each life cycle of a human being, including death. Daly explained that he could not allow Waits to do an unofficial project but asked him if he would be interested in creating an autopsy video for educational and professional purposes.

In March 1999, the Hamilton County chief deputy coroner Dr. Carl Parrott held a meeting with Daly, Waits, Rhonda Lindemann, the Hamilton County Coroner's office administrator, and Condon to discuss making the proposed autopsy-training video. Dr. Robert Pfalzgraf, chief deputy coroner of pathology, may have been present at this meeting. The participants discussed that the video was to be used in a "death investigation" seminar designed to provide a detailed account of a death investigation, starting with the death and ending with a prosecution. The meeting adjourned with Parrott stating that he would contact the prosecutor's office for an opinion regarding the legal ramifications of videotaping corpses–particularly whether consent of the families was needed.

Parrott testified that they discussed one of Waits's personal projects at the meeting, but he did not recall discussing anything proposed specifically by Condon. Daly recalled that there was some initial discussion regarding whether Waits and Condon could do their projects as a "quid pro quo" if they worked on the training video. Waits testified that Condon's project was discussed at the meeting and that Condon had given Parrott material pertinent to his project. Waits recalled that he was told that, before going forward with any of the projects, the coroner's office needed to secure permission from the prosecutor's office. He also recalled being told that the coroner's office would maintain complete control over any photographic images.

The coroner's office subsequently received an opinion from the prosecutor's office regarding the propriety of using morgue corpses for an autopsy-training video. Although the letter was not admitted into evidence, Daly testified that the letter stated that use of morgue corpses for the video would be permissible only with court approval and/or the consent of the next of kin. Daly also testified that Parrott had declined the requests of Waits and Condon to pursue their individual projects.

4

In July 2000, Waits and Condon received permission to enter the morgue to determine what resources they would need to make the autopsy-training video.  According to Parrott, Condon was granted only limited access to the morgue to view one autopsy and to take limited photographs of the autopsy for the sole purpose of assessing the cost of the autopsy-training video.  Parrott testified that Condon was not given permission to take or keep photographs for his personal use.

Condon then visited the morgue on at least two occasions with official authorization in August 2000.  On the first visit, both Waits and Condon merely assessed the autopsy room.  On the second visit, on August 16, Condon videotaped Pfalzgraf performing an autopsy on John Brady.  Pfalzgraf testified that Condon also took still pictures of the procedure.

Subsequent discussion ensued regarding the cost of the training video.  Waits submitted an estimate of $10,000.  Both Parrott and Lindemann testified that the coroner's office did not have the necessary funds in its budget and that consequently the project was put in abeyance.

There was a welter of testimony regarding who knew what and when with regard to the cancellation of the video project.  Parrott testified that he informed Lindemann that the autopsy-training video had been cancelled and that Condon no longer had permission to be in the morgue after the project was cancelled.  Pfalzgraf testified that he was never informed that the videotape project had been discontinued or that Condon was not allowed in the morgue.  Daly further testified that he informed Waits in September that the autopsy-training video project could not be completed based on the budget set for 2000 and 2001.  Daly testified that he informed Condon in October that the autopsy-training video project would not go forward.

*B. Life Cycles*

After October 2000, with the autopsy-training video project cancelled or on hold, Condon no longer had official authorization to be in the morgue for any purpose, let alone taking pictures of morgue corpses.  Nonetheless, evidence was presented that after October 2000 Condon continued to visit the morgue and continued to take pictures of morgue

5

corpses, apparently for the purpose of his own pet project, "life cyles," for which, as noted, he had been officially denied permission. During this period of unauthorized entry, he took pictures of the bodies of Adam Richardson, Perry Melton, Thomas Senteney, Debbie Beckman, Barbara Sowards, and Jonathan Frith. The pictures of Frith were apparently taken during the young boy's autopsy. In some of the pictures, Condon had placed props on or near the body, while some of the pictures were simply of the body lying in a state of repose.

Finally, on January 7, 2001, Tyrone Smith and Clyde Gamble, both morgue attendants, saw Condon come into the morgue in the afternoon. According to Smith, he, Gamble, and Dr. Jonathan Tobias, a junior pathologist, were alone in the morgue when Condon came in with his camera equipment. According to Gamble, Condon talked with Tobias about the smell coming from an autopsy Tobias was performing at the time and then entered a cooler where cadavers were stored in body bags. Gamble observed Condon bring in lighting equipment. Smith and Gamble testified that Condon spent one to one and one-half hours in the cooler. Gamble testified that Condon came out of the cooler a number of times to get paper towels. At some point, Smith entered the cooler to get a body for a funeral home, and he saw Condon standing by Christina Folchi's body with photographic lights positioned around it. Smith testified that Condon appeared to be taking pictures of Folchi, a nineteen-year-old accident victim, and that her body was completely exposed. Subsequent pictures of the body taken by Condon and obtained by the police showed Folchi's body with a catheter tube in her incision, cloth over her eyes, objects on her body (a snail shell, a "Will" card, and sheet music, some of which were positioned in her pubic area), a book by her side, and a key in her mouth.

On January 8, 2001, Brent Erke was working at Robin Imaging Photography Lab ("Robin Imaging") when he noticed some "questionable" black-and-white film being reproduced into a negative format. Erke was shocked and mortified by the negatives and notified his boss and owner, William Johnson, who examined the negatives and then called the police. Johnson confirmed that the film had been brought in by Condon. At the request of the police, Johnson made a copy of the negatives and returned the original set to Condon.

Police obtained a warrant to search Condon's studio, located in Hamilton County.  Props identical to those used in some of the photographs were discovered, as well as both negatives and developed photographs depicting cadavers with props placed next to the bodies.  Condon's car was also searched, and the police recovered other props used in the photographs.

The police were able to identify the bodies pictured in the negatives and photographs recovered from Condon.  Records were introduced into evidence demonstrating the date and time each body was brought into the morgue and released.  With the exception of the Brady corpse, none of the bodies had been in the morgue at a time when Condon was authorized to be in the facility.

Cal Kowal, a professor of art at the Cincinnati Museum Art School, testified on Condon's behalf.  He testified that photography was an "art form."  Kowal stated that, in traditional photography, the artist worked first with a negative to create his work.  He stated that, historically, art dealt with the body and that there had always been representation of corpses.  According to Kowal, artists did take pictures of corpses.  He stated that Andres Serrano had a show of photographs taken in a morgue, and that Joel-Peter Witkin worked with body parts.  In Kowal's opinion, Condon's project of "life cycles" was a "valid concept."

(*Id.,* Ex. V, pp. 3-8).

Petitioner's counsel filed a motion for reconsideration, which was denied by the Ohio Court of Appeals on June 13, 2003. (*Id.,* Exs. W, AA).  Petitioner's counsel also timely appealed to the Ohio Supreme Court, asserting as propositions of law essentially the same claims of error that had been raised on direct appeal. (*See id.,* Ex. BB).  On September 10, 2003, the Ohio Supreme Court declined jurisdiction to hear the case and summarily dismissed the appeal "as not involving any substantial constitutional question."  (*Id.* Ex. DD).

In the meantime, on June 4, 2003, petitioner's counsel also filed a "motion for leave to file a motion for new trial on the basis of newly discovered evidence" pertaining to renumbered Count Five with the Hamilton County Common Pleas Court. (*Id.,* Ex. HH).  The motion was denied on July 24, 2003.  (*Id.,* Ex. KK).  Petitioner

7

timely appealed to the Ohio Court of Appeals, First Appellate District, which had not issued an opinion on the matter by the time respondent filed the return of writ in the instant action. (*See* Doc. 4, Brief, p. 6; Doc. 6, Ex. LL).

On April 23, 2004, in a published decision, *see State v. Condon*, 808 N.E.2d 912 (Ohio Ct. App. 2004), the Ohio Court of Appeals reversed the trial court's denial of petitioner's motion for leave to file a motion for new trial and remanded the matter to the trial court for hearing on petitioner's motion for new trial. (*See also* Doc. 17). On May 11, 2004, the Ohio Court of Appeals also granted a stay in execution of the six months that remained of petitioner's prison sentence. (*Id.,* Ex. A). Eventually, on August 10, 2004, the Common Pleas Court issued an Entry dismissing Count Five of the indictment "in the interest of justice." (*Id.,* Ex. B). Petitioner states that because Count Five was dismissed, he has "completed serving his prison sentence as to all counts against him." (*Id.,* p. 1).

Petitioner's counsel initiated the instant federal habeas corpus action on petitioner's behalf on December 16, 2003, during the pendency of the state proceedings on petitioner's new trial motion. (*See* Doc. 1). Petitioner alleges six grounds for relief.

**Ground One:** Conviction obtained as a result of prosecutorial misconduct/due process violations.

**Supporting Facts:** The prosecutor in this case committed misconduct in closing argument by impugning defense counsel, referring to facts not in evidence, and improperly appealing to the jurors' emotions. The prosecutor also committed misconduct by failing to disclose exculpatory evidence before or during trial and by pursuing the case against Petitioner despite an actual conflict of interest.

**Ground Two:** Conviction obtained in violation of the First Amendment.

**Supporting Facts:** Petitioner was convicted of gross abuse of a corpse for photographing bodies in the Hamilton County Morgue. The photographs were created for artistic purposes and are therefore protected by the First Amendment.

8

**Ground Three:** Conviction obtained in violation of Fourth Amendment search and seizure provision.

**Supporting Facts:** The police searched Petitioner's photography studio pursuant to a warrant that was unsupported by probable cause. The police seized evidence that was later introduc[]ed at Petitioner's trial.

**Ground Four:** Conviction was obtained pursuant to an unconstitutionally vague and overbroad statute.

**Supporting Facts:** Petitioner was convicted pursuant to Ohio's gross abuse of a corpse statute, which specifies that activities which offend community sensibilities can constitute a felony offense. The element of community sensibilities is undefined and therefore fails to provide sufficient notice as to what it prohibits.

**Ground Five:** Conviction was obtained in violation of right to trial by jury because the trial court improperly instructed the jury.

**Supporting Facts:** The trial court failed to properly instruct the jury on essential elements of the crime, on the concept of aiding and abetting, and on the terms "public office" and "public official."

**Ground Six:** Sentence imposed in violation of Eighth Amendment cruel and unusual punishment clause.

**Supporting Facts:** Petitioner was originally sentenced to a 30 month term of imprisonment. That sentence was reduced by the Ohio Court of Appeals to 18 months. Any prison sentence at all is disproportionate and cruel and unusual in this case.

(*Id.,* pp. 5-6 & Addendum).[6]

---

[6]In a summary judgment motion submitted after the return of writ was filed, petitioner's counsel asserted as an additional argument that the jury's verdicts of guilt were against the weight of the evidence and were based on insufficient evidence. (*See* Doc. 8, pp. 44-48). Petitioner, who is represented by counsel, did not raise any such claim as a ground for relief in his habeas corpus petition (*see* Doc. 1), nor did respondent defend against such a claim in the

In the return of writ, respondent does not argue, nor does the record reflect, that the petition is barred from review on statute of limitations grounds. (*See* Doc. 4, p. 13). Moreover, it appears that petitioner has exhausted all available state court remedies with respect to his grounds for relief. Therefore, the Court will proceed to address each of petitioner's claims in light of respondent's arguments that are asserted as defenses in the return of writ.

## OPINION

### A. Petitioner Is Not Entitled To Habeas Relief Based On the Prosecutorial Misconduct Claims Alleged In Ground One Of the Petition

In Ground One of the petition, petitioner contends he was denied due process due to certain acts of misconduct committed by the prosecutor during the state criminal trial proceedings. Petitioner asserts that the prosecutor made improper comments in closing argument, failed to disclose exculpatory evidence and pursued the criminal case against petitioner despite a "conflict of interest." (Doc. 1, p. 5).

With respect to his claim of impropriety during closing argument, petitioner has specified in his summary judgment motion the statements that purportedly constituted "misconduct" on the prosecutor's part. First, he challenges the following objected-to remarks, which were made by the prosecutor in rebuttal to defense counsel's closing argument, on the ground that they "denigrated the role of defense counsel" (*see* Doc. 8, pp. 14-15):

---

return of writ (*see* Doc. 4). Petitioner has never sought to amend the petition to add a sufficiency of evidence claim as a ground for relief. Therefore, the claim is deemed waived. In any event, to the extent petitioner contends his convictions are against the weight of the evidence, he raises a state-law issue only that is not cognizable in this federal habeas corpus proceeding. *See* 28 U.S.C. § 2254(a); *see also Tibbs v. Florida,* 457 U.S. 31, 41-47 (1982); *State v. Thompkins,* 678 N.E.2d 541, 546 (Ohio 1997), *superseded by state constit. amend. on other grounds as stated in State v. Smith,* 684 N.E.2d 668 (Ohio 1997). Moreover, upon review of the record, the Court concludes that under the applicable standard of review set forth in *Jackson v. Virginia,* 443 U.S. 307 (1979), for assessing the sufficiency of evidence under the Due Process Clause, a rational juror could find petitioner guilty beyond a reasonable doubt of the seven gross abuse of corpse offenses that have been upheld by the state courts (i.e., renumbered Counts Two, Six, Seven, Nine, Ten, Eleven and Twelve involving deceased victims John Brady, Thomas Senteney, Jonathan Frith, Debbie Beckman, Adam Richardson, Barbara Sowards and Christina Folchi).

> There are some things that scream out to be addressed and I'm going to start with some of [defense counsel's] comments.
>
> First of all, he has the audacity to come into this courtroom in front of you, in front of the relatives of these victims, and refer to this bullshit project as art, is an insult to the victims and especially to the families.

(Doc. 5, Tr. 1473).

He further cites the following statements, which were not objected to at trial, as falling within this category of misconduct:

> . . . . It's outrageous that they would even consider calling that art work.

(*Id.,* Tr. 1476).

> . . . .Everyone knew that it was going to be Dr. Parrott's video.  Nothing else was going on.  Now, this is back when Ernie Waits had this fresh in his mind, *before he had a little meeting with all the defense attorneys on the defense team, before he had a chance to have his memory altered in some fashion*. . . .

(*Id.,* Tr. 1480) (emphasis added).

Second, petitioner claims that during rebuttal argument, the prosecutor improperly commented on evidence outside the record by (1) "repeatedly gestur[ing] towards unidentified individuals in the gallery and emphasizing their presence by referring to them as 'famil[ies]'" of the victims; and (2) pointing out that a county clerk, who "did some things with the photographs that he should not have done," would "be dealt with" by way of an employment disciplinary procedure.  (*See* Doc. 8, p. 15 & n.4; *see also* Doc. 5, Tr. 1473, 1478).

Third, petitioner cites numerous remarks made by the prosecutor in closing and rebuttal argument, some of which were objected to by defense counsel, wherein he implied that petitioner's photographs and conduct were of an inappropriate sexual nature.  (*See* Doc. 8, pp. 15-16 & n.5; *see also* Doc. 5, Tr. 1388, 1389, 1391, 1482, 1483, 1485-86).  Petitioner also contends the prosecutor improperly appealed to the jurors' emotions by often using inflammatory language (*see* Doc. 5, Tr. 1388-89,

11

1393, 1397, 1404-05) and by warning the jurors to "be careful" in looking at a certain photograph and handling a book used as a prop, both of which had been introduced into evidence for the jury's consideration, to the extent these items showed the victims' bodily fluids had leaked as a result of petitioner's manipulation of their body parts (*see id.,* Tr. 1390-91, 1393-94). (Doc. 8, p. 16).

With respect to his claim that the prosecutor withheld evidence favorable to the defense, petitioner contends in his summary judgment motion that the State failed to disclose an opinion letter issued by the Hamilton County prosecutor's office permitting the taking of photographs and videos of corpses without family permission in certain circumstances. (*Id.,* pp. 26-27).

Finally, with respect to his claim that the prosecutor was acting under a "conflict of interest," petitioner contends in his summary judgment motion that two weeks prior to the issuance of the criminal indictment in this case, Hamilton County was named as a defendant in a civil action "stemming from the same actions which later served as the basis for [the] indictment." (Doc. 8, p. 40). He further asserts that as the attorney for Hamilton County, the prosecutor "in effect represented the county in the civil action," and a "conflict of interest" was created when "the prosecutor's office even contemplated indicting [petitioner] for the same alleged conduct." (*Id.*). It is petitioner's position that the indictment and his resulting convictions were "tainted and must be overturned," because "[i]t is impossible to know whether the prosecutor would have even pursued an indictment . . . in the absence of the conflict created by his knowledge of and participation in the civil action;" therefore, it must be assumed that the prosecutor was acting to protect "the interests of his client – the county – in pursuing the indictment." (*Id.,* pp. 40-41).

Petitioner raised all of these claims of prosecutorial misconduct in the state direct appeal proceedings. The Ohio Court of Appeals was the only state court to render a reasoned decision addressing the merits of such claims.

First, with respect to petitioner's claim that the prosecutor improperly withheld an opinion letter issued by the Hamilton County prosecutor's office, the court determined on consideration of a separate assignment of error regarding the trial court's alleged error in excluding the letter in question from evidence that the prosecution was not required under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose the letter, which had been proffered for the court's *in camera* review, because it "did not constitute material evidence pertaining to Condon's guilt or innocence for

abusing corpses under R.C. 2927.01." (Doc. 6, Ex. V, pp. 17-18). The court stated that the letter instead concerned "an entirely different matter under an entirely different statute," as it "addressed the propriety of the coroner's office producing an autopsy-training video" without the consent of next of kin under a separate provision set forth in Ohio Rev. Code § 2741.02, which "protects an individual's persona against its misappropriation for commercial purposes." (*Id.*).[7]

> In so holding, the court reasoned:
>
> The letter was not favorable to Condon's defense, nor was there a reasonable probability that the result of the proceeding would have been different had the letter been disclosed. Indeed, it is likely that the letter, if presented to the jury, would have served only one purpose: to confuse the issues, creating the false impression in the jurors' minds that Condon was somehow charged with the intellectual-property crime of appropriating the corpses' personas for commercial purposes rather than abusing them by treating them as models for his photographic art. To the extent the letter stressed the importance of taking steps to conceal the identity of any corpse used in a training video, such confusion may have significantly damaged Condon's defense since he took absolutely no steps to conceal the identity of the corpses that he photographed.

(*Id.,* pp. 18-19).

Later in its decision, the Ohio Court of Appeals rejected petitioner's related claim raised in another assignment of error that he was denied a fair trial due to the prosecutor's misconduct in failing to disclose the opinion letter to the defense. The court reasoned: "[W]e have already held that the trial court did not err in excluding

---

[7]It appears that in the letter, the prosecutor's office advised that "if the training video w[ere] reproduced and sold for commercial purposes, then it would be necessary to obtain the consent of the next of kin pursuant to R.C. 2741.02. Conversely, the prosecutor's office also advised that if the training video did not violate the restrictions on commercial use, then the video would be exempt from the provisions of R.C. Chapter 2741." (Doc. 6, Ex. V, p. 18). In addition, to address concerns about the commercial appropriation of a corpse's identity, the letter advised that "any autopsy-training video had to take precautionary steps to conceal the subject's identity." (*Id.*). Specifically, the letter provided: "Steps should be taken to conceal the physical features and other identifying traits such as: tattoos, amputations, noticeable scarring, glass eyes, etc." (*Id.*).

that letter.  Certainly, then, Condon was not entitled to a new trial on that basis." (*Id.,* p. 31).

Second, the Ohio Court of Appeals rejected petitioner's "conflict of interest" claim that had been raised in his seventh assignment of error on direct appeal.  The court addressed this claim in relevant part as follows:

> Condon claims that he was denied due process because the prosecutor improperly appeared before the grand jury seeking an indictment against Condon two weeks after a civil lawsuit had been brought by the families of the deceased victims against certain Hamilton County employees, including Tobias, and Condon.  Condon claims that, because the Hamilton County Prosecutor's office was required by law to represent county employees in the civil lawsuit, a conflict existed when the prosecutor's office indicted Condon and Tobias for crimes related to the civil lawsuit.

> Traditionally, where there is a potential conflict of interest, the trial court must hold an evidentiary hearing and issue findings of fact when determining if the improper appearance can be overcome. . . .  But because the relationship between attorneys in a government office is different than the relationship between those in a private firm, the mere appearance of impropriety in a government office is not sufficient in and of itself to warrant vicarious disqualification. . . .

> Here, the trial court held a hearing on the motion to dismiss the indictment.  At the hearing, Condon presented no additional evidence supporting the motion, but rested solely on the fact that the civil law suit had been filed on January 26, 2001, against Hamilton County employees, and that the suit included Condon and Tobias.  After considering the arguments, the trial court overruled Condon's motion, but ruled that Condon retained the right to submit further written evidence to support the claim of actual conflict.  At no time prior to trial did Condon offer supplemental proof.  In the absence of such supplemental proof in the record, we conclude that the trial court correctly ruled that Condon had not established grounds for a vicarious disqualification of the prosecutor's office based upon a conflict of interest.

14

(*Id.,* pp. 19-20) (state case citations omitted).

Finally, the Ohio Court of Appeals addressed petitioner's contentions that the prosecutor engaged in misconduct during closing argument. In rejecting these claims of error, the court ruled in relevant part as follows:

> . . . .In order to reverse a conviction based on prosecutorial misconduct, the alleged misconduct must have deprived the defendant of a fair trial... The prejudicial effect of the alleged misconduct must be considered in the context of the entire trial, and not simply the immediate context in which the misconduct occurred. . . . Condon vigorously complains about the following remarks made by the prosecution during closing argument:

> "There are some things that scream out to be addressed and I'm going to start with some of [Condon's defense attorney's] comments.

> "First of all, he has the audacity to come into this courtroom in front of you, in front of the relatives of these victims, and refer to this *bullshit project as art*, is an insult to the victims and especially the families." (Emphasis supplied.)

> Condon's attorney objected to the comments. The trial court overruled the objection but gave the jury a general curative instruction that the remarks of counsel were not to be considered evidence. The prosecutor followed by stating, "It's outrageous that they would even consider calling that art work." No objection was raised.

> The prosecution is allowed wide latitude to highlight the relative strengths of its case and the relative weakness of the defense, but this latitude does not extend as far as letting the prosecution denigrate the role of defense counsel. . . . A prosecutor may not denigrate counsel by insinuating that the defense is hiding the truth. . . .

> The state argues that the prosecutor's comments were warranted because they were made in response to the atmosphere created by Condon's counsel. But, upon our review of the record, it was Tobias's counsel who actually made the comments that were alleged to have caused the antagonistic atmosphere. And regardless of any rancor between counsel,

15

we consider the prosecutor's use of the phrase "bullshit project as art" grossly unprofessional and clearly meant to inflame the jury.  Further the prosecutor's comments suggested to the jury that defense counsel was seeking to deceive the jury by deliberately fabricating a false artistic purpose behind Condon's behavior.   In our view, the prosecutor's comments were highly inappropriate and constituted prosecutorial misconduct.

The next alleged instance of misconduct occurred a little while later, when the prosecutor stated during closing argument, in rebuttal, that defense counsel had improperly influenced one of their own witnesses.  The prosecutor stated, "Now, this is back when Ernie Waits had this fresh in his mind, before he had a meeting with all of the defense attorneys on the defense team, before he had a chance to have his memory altered in some fashion, ***."  No objection was raised to this comment.  Again we hold the suggestion that Condon's defense was fabricating evidence entirely inappropriate.

Condon further alleges that the prosecution made numerous improper remarks to the jury suggesting that both Condon and Tobias (who, it must be remembered, were tried together) derived some fetishistic sexual pleasure from the bodies photographed.  For example, commenting upon Tobias, the prosecution stated, "Now, we start getting into it.  You start seeing the sexual overtones that start to pop up in these that are almost identical to what his buddy, the photographer Thomas Condon, takes."  Other remarks by the prosecution included the following: (1) Condon molested F[o]lchi's body; (2) Condon had "his way with Christina Folchi and Toby Malakoff;" (3) the jury was to pay attention to the progression of "what happens to clothes" when viewing the photographs; and (4) the photographs depicted a "striptease."   Another such remark occurred during rebuttal in closing argument where the prosecutor, in talking about crime-scene photographs taken by Tobias, stated, "Here's another photograph.  Shirt is down. *** Now, that is not enough so now we are going to roll the body over and we are going *to place emphasis on the breast.*"  (Emphasis supplied.)

During closing arguments, the prosecutor must avoid going beyond the evidence presented to the jury. . . .   But what was reflected in the

16

photographs and the opportunity to take the photographs were very much at issue in this case. The state's basic argument was that the pictures taken by Condon were taken without permission from the coroner's office, and that they were not taken for official business but, rather, for reasons personal to Condon. The argument that the photographs bore some sexual interest could have arguably gone to the jury's consideration of whether the pictures were to be used for "official business" or personal reasons, as well as to Condon's culpable mental state. For these reasons, such comments were not improper under the facts of this case.

The next instances of misconduct alleged by Condon relate to whether the state improperly appealed to the jury's emotions. During closing argument, the prosecutor referred to the pictures of Frith as "revolting and repulsive," the pictures of Folchi as "disgusting," and the picture of Melton as "horrific." The prosecutor also stated that the way the bodies were "manipulated, propped, pulled, posed, the way they whirled around the live-action camera, it's disgusting, it's revolting and it's repulsive." No objections were raised to these comments.

The last instance of prosecutorial misconduct cited by Condon concerns the prosecutor's two warnings to the jury to "be careful" when handling the photographs that had been placed in evidence because they might contain "blood or other bodily fluids." Defense counsel again raised no objections to these comments.

Considering all these remarks in the context of the trial, we view them as disturbing, and, in some instances, as improper, but we are not convinced that they were of sufficient magnitude to have prejudicially affected Condon's constitutional right to a fair trial. This was a lengthy case charged with emotion. Without condoning the prosecutor's episodes of misconduct, we believe that the trial court's instructions to the jury when an objection was made cured any impropriety with respect to those remarks. Moreover, after careful consideration of the record in its entirety, we cannot say that the prosecution's remarks that were not objected to by Condon amounted to plain error. . . . In order to prevail under a plain-error analysis, the defendant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. . . . None of the cited comments, even if

arguably inappropriate, were so prejudicial or outcome-determinative as to constitute plain error and to deny Condon a fair trial.

In sum, we are convinced that, for the most part, the prosecutors focused on the evidence presented during the state's case and what the prosecutors perceived as the weaknesses in Condon's case.  So even though some of the comments were inappropriate and inexcusable, we do not conclude that their impact was sufficient to warrant a new trial.

(*Id.*, pp. 27-31) (state case citations omitted).

Under the applicable standard of review set forth in 28 U.S.C. § 2254(d), petitioner is not entitled to relief in this federal habeas corpus proceeding unless the state court's adjudication of his constitutional claims stemming from the allegations of prosecutorial misconduct resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 402-03 (2000) (O'Connor, J., writing for majority on this issue); *Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998).

A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court under § 2254(d)(1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams,* 529 U.S. at 405-06 (O'Connor, J.); *Harris,* 212 F.3d at 942.  An "unreasonable application" of Supreme Court precedent occurs (1) if the state court identifies the correct legal standard but unreasonably applies it to the facts of the case, or (2) if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams,* 529 U.S. at 407-08 (O'Connor, J.).

Under § 2254(d)(1)'s "unreasonable application" clause, a federal habeas corpus court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411 (O'Connor, J.); *see also McGhee v. Yukins,* 229 F.3d 506, 510 (6ᵗʰ Cir. 2000); *Harris,* 212 F.3d at 942. The reasonableness inquiry is an objective one; it does not involve a subjective inquiry into whether or not reasonable jurists would all agree that the state court's application was unreasonable. *Williams,* 529 U.S. at 409-10 (O'Connor, J.); *see also Washington v. Hofbauer,* 228 F.3d 689, 698 (6ᵗʰ Cir. 2000); *Harris,* 212 F.3d at 942-43. Moreover, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee,* 229 F.3d at 510, 512 (citing *Williams,* 529 U.S. at 412).

In this case, the Ohio Court of Appeals first correctly identified and applied the standard of review enunciated by the Supreme Court in *Brady v. Maryland,* 373 U.S. 83 (1963), in addressing petitioner's claim that the prosecutor withheld exculpatory evidence from the defense. In *Brady,* the Supreme Court held that the prosecution is required by the Fourteenth Amendment's Due Process Clause to disclose evidence in its possession that is both favorable to the accused and material to guilt or punishment. *Brady,* 373 U.S. at 87; *see also United States v. Bagley,* 473 U.S. 667, 674 (1985).

*Brady* did not create a broad constitutional right of discovery in a criminal case, but rather is premised on "the avoidance of an unfair trial to the accused," *Brady,* 373 U.S. at 87. *Bagley,* 473 U.S. at 675 & n.6-7. Therefore, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Id.* at 675.

To establish a *Brady* violation, it must be shown that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the suppressed evidence was material to guilt or punishment, "irrespective of the good faith or bad faith of the prosecution." *Moore v. Illinois,* 408 U.S. 786, 794-95 (1972); s*ee also Brady,* 373 U.S. at 87; *Bowling v. Parker,* 138 F.Supp.2d 821, 880 (E.D. Ky. 2001), *aff'd,* 344 F.3d 487 (6ᵗʰ Cir. 2003), *cert. denied,* 542 U.S. 842 (2004). Evidence is deemed "material" under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Id.* "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish

19

'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-10 (1976). This standard for determining materiality focuses on the defendant's guilt or innocence, rather than on the impact of the undisclosed evidence on the defendant's ability to prepare for trial. *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir. 1991) (citing *Agurs,* 427 U.S. at 112 n.20), *cert. denied,* 504 U.S. 930 (1992).

Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. *Bagley,* 473 U.S. at 676. On the other hand, evidence that tends to inculpate the defendant or that is neither facially exculpatory nor impeaching does not fall under *Brady*'s proscription. *United States v. Simpson,* 901 F.2d 1223, 1228 (5th Cir. 1990); *United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir. 1988); *cf. Agurs,* 427 U.S. at 112 n.20; *Phillip,* 948 F.2d at 250.

It was reasonable for the Ohio courts to conclude that the opinion letter issued by the Hamilton County prosecutor's office in this case did not constitute material exculpatory evidence that the prosecutor was required to disclose under *Brady*. Petitioner does not dispute the Ohio Court of Appeals' factual determination that the letter did not address the parties' potential criminal liability under Ohio's abuse of corpse of statute, but rather only concerned "the propriety of the coroner's office in producing an autopsy-training video without the consent of kin" under an entirely different Ohio statute governing the misappropriation of an individual's persona for commercial purposes. (*See* Doc. 8, pp. 27-28). As the Ohio Court of Appeals reasonably determined, the letter thus was neither favorable to petitioner's defense nor "material."

Petitioner was not indicted for any involvement with the coroner's office in creating an autopsy-training video, but rather under Ohio's abuse of corpse statute for his use of morgue corpses as "models" in his personal, photographic "life cycles" art project. Therefore, as the Ohio Court of Appeals found, the letter was not relevant to the issue of petitioner's guilt or innocence in this case and, if disclosed and introduced into evidence at trial, would not have created a reasonable probability of a different trial outcome. Indeed, as the Ohio court further found, it is likely the introduction of the letter into evidence would have served to confuse the issues by giving the jurors the "false impression" that petitioner was charged with the crime of misappropriating the corpses' personas for commercial purposes. Because the letter in question advised that precautionary steps had to be taken to conceal the identity of any morgue corpse used in a training video, it actually could be have been considered by jurors as inculpatory evidence given that petitioner "took absolutely no steps to conceal the

identity of the corpses that he photographed." (*See* Doc. 6, Ex. V, p. 19).

The Ohio Court of Appeals did not rely on well-established federal law as determined by the United States Supreme Court in rejecting petitioner's second claim of misconduct stemming from the prosecutor's alleged "conflict of interest" in seeking an indictment against petitioner. However, on *de novo* review of this claim, the Court concludes that petitioner has not shown the challenged conduct amounted to error of constitutional dimension sufficient to warrant federal habeas corpus relief in this case.

This case is analogous to *Wright v. United States,* 732 F.2d 1048, 1056 & n.7 (2nd Cir. 1984) (Friendly, J.), *cert. denied,* 469 U.S. 1106 (1985), to the extent that petitioner's claim is more appropriately phrased as involving the purported deprivation of a "disinterested" prosecutor rather than an actual "conflict of interest" on the prosecutor's part.[8]   As Judge Friendly pointed out, "[t]he concept [of prosecutorial disinterestedness] is not altogether easy to define." *Id.*

In the usual case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *United States v. Armstrong,* 517 U.S. 456, 464 (1996) (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978)); *see also Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248 (1980) ("Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process."). Moreover, unlike judges, prosecutors are not required to be "entirely 'neutral and detached'" and, indeed, as part of the adversarial system, "are necessarily permitted to be zealous in their enforcement of the law." *Marshall,* 446 U.S. at 248-49; *see also Dick v. Scroggy,* 882 F.2d 192, 197 (6th Cir. 1989); *Wright,* 732 F.2d at 1056 (a prosecutor "need not be disinterested on the issue whether a prospective defendant has committed the crime with which he is charged," and "[i]f honestly convinced of the defendant's guilt, . . . is free, indeed obliged, to be deeply interested in urging that view by any fair means").

---

[8]As Judge Friendly noted in *Wright,* "[i]n cases like this, where there is no basis for a claim that the prosecutor did not believe the defendant to be guilty, the claim is not that the prosecutor had an interest in opposition to his proper one in securing an indictment and a conviction; it is rather that he had an additional and impermissible reason in forwarding the prosecution." *Wright,* 732 F.2d at 1056 n.7.

Although in the absence of evidence to the contrary, it must be presumed that prosecutors "have properly discharged their official duties," the Due Process Clause does impose some limits on their discretion. *Armstrong,* 517 U.S. at 464; *Marshall,* 446 U.S. 249. Prosecutors are also public officials who must serve the public interest. *Berger v. United States,* 295 U.S. 78, 88 (1935), *overruled on other grounds by Stirone v. United States,* 361 U.S. 212 (1960). The Supreme Court "has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions . . . were motivated by improper factors or were otherwise contrary to law." *Marshall,* 446 U.S. at 249. The Court has recognized that a "scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision," which "in some contexts raise serious constitutional questions." *Id.* at 249-50. The Court has yet to precisely define the constitutional limits "on a financial or personal interest of one who performs a prosecutorial function," but has held that due process is not violated where the "influence alleged to impose bias is exceptionally remote." *See id.* at 250.

Here, as the Ohio Court of Appeals recognized, petitioner's claim of impropriety is premised solely on the fact that a civil lawsuit was filed against the Hamilton County commissioners, two unnamed county employees, and petitioner two weeks prior to the indictment's issuance, and "[a]s the attorney for Hamilton County, the prosecutor in effect represented the county in the civil action." (Doc. 8, p. 40; *see also* Doc. 5, Tr. 43). Petitioner generally contends that the prosecutor may have been motivated to pursue the indictment against him in order to insulate the county from liability in the civil action. Petitioner also suggests that if the civil lawsuit had not been filed, the prosecutor may not have gone forward with his criminal prosecution. (*See* Doc. 8, p. 40).

Petitioner has not presented any evidence in support of these conclusory and speculative allegations. In fact, it affirmatively appears from the record that, contrary to petitioner's position, before the civil lawsuit was filed on January 26, 2001, petitioner and Tobias already were under criminal investigation for their activities at the county morgue; the search warrant on petitioner's studio had been executed on January 10, 2001, and Tobias had been suspended without pay from employment at the coroner's office on January 16, 2001. (*See* Doc. 5, Tr. 42-43; *see also* Doc. 6, Ex. E, Affidavit For Search Warrant). In addition, on February 22, 2001, within a month after the civil action commenced, but after the indictment was returned, a private law firm was appointed as "special counsel" to defend the county's interest in lieu of the

22

prosecutor's office in the civil suit. (*See* Doc. 5, Tr. 47, 57).

There is no evidence in the record even remotely suggesting that the prosecutor actually was involved in the litigation of the civil case, or did anything other than seek the appointment of special counsel to take over the county's defense in that case. Moreover, petitioner has neither argued nor presented evidence rebutting the prosecutor's statement on the record to the trial court that "in the period between the time the crime was discovered and the time that special counsel was appointed, there was no conflict" because "the prosecutor had no contact or . . . connection with . . . Tobias during that period of time;" there was "no confidential exchange of information;" and the prosecutor had "no direct financial interest in the outcome of [the] civil case." (*Id.,* Tr. 66-67).

The prosecutor stated on the record that the defendants were indicted solely on the basis of evidence presented to the grand jury, which was obtained by the police during their investigation of the case. (*Id.*, Tr. 67). Petitioner does not contend that this evidence was fabricated or otherwise insufficient to warrant the indictment. The record is further devoid of any evidence that the prosecutor had a personal stake in either the civil litigation or petitioner's criminal prosecution, that there otherwise was an actual conflict of interest on the prosecutor's part during the time between the discovery of the crime and the appointment of special counsel to represent the county in the civil case, or that petitioner was prejudiced in any way by the alleged appearance of impropriety by the prosecutor during that time period. Therefore, based on the present record, the Court is not persuaded that the prosecutor's pursuit of an indictment in this case before special counsel was officially appointed to represent Hamilton County in the related civil action amounted to an "irregularity 'sufficiently fundamental' to justify . . . setting aside [petitioner's state] conviction" in this federal collateral review proceeding. *Cf. Dick,* 882 F.2d at 196-97; *Wright,* 732 F.2d at 1056-58 (rejecting petitioner's claim that the "special interest" of the state prosecutor in securing his indictment violated due process based on allegations, which at most, implied that petitioner might not have been indicted by another prosecutor "for a crime which, as the jury's verdict demonstrates, he had in fact committed").[9]

---

[9]*See also United States v. Terry,* 17 F.3d 575, 579 (2nd Cir.), *cert. denied,* 513 U.S. 946 (1994); *In re Grand Jury Subpoena of Rochon,* 873 F.2d 170, 174-76 & n.3 (7th Cir. 1989); *United States v. Troutman,* 814 F.2d 1428, 1437-39, 1441-42 (10th Cir. 1987); *United States v. Hart,* 779 F.Supp. 883 (E.D. Mich. 1991); *United States v. McDade,* No. Crim.A. 92-249, 1992 WL 187036 (E.D. Pa. July 30, 1992) (unpublished); *see generally Bank of Nova Scotia v. United*

With respect to petitioner's final claim of prosecutorial misconduct during closing argument, this Court is mindful that the scope of federal habeas corpus review of such claim is narrow because the federal court does not sit as an appellate court with supervisory power to rectify general trial errors. *Donnelly v. DeChristoforo,* 416 U.S. 637, 642 (1974). Although preliminarily the court confronted with a claim of prosecutorial misconduct in closing argument must determine whether the challenged remarks were improper, a finding of impropriety is not sufficient in itself to amount to a due process violation. *See, e.g., Darden v. Wainwright,* 477 U.S. 168, 179-80 (1986). Rather, "[t]he touchstone of due process analysis in such a case is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982).

Where, as here, no specific constitutional right is alleged to have been infringed by the prosecutor during closing argument, the prosecutorial misconduct claim is one of ordinary trial error, which does not rise to the level of a constitutional violation unless the misconduct "so infected the trial with unfairness as to render the resulting conviction a denial of due process."
prosecutor's conduct was 'undesirable or even universally condemned,' this Court can only provide relief if the [challenged statements were] so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process violation.") the defendant of a fair trial. *United States v. Young,* 470 U.S. 1, 11-12 (1985).

Factors to be considered in weighing whether a prosecutor's misconduct amounts to a due process violation are: (1) the degree to which the misconduct has a tendency to mislead the jury and to prejudice the accused, *see Darden,* 477 U.S. at 182, and *Young,* 470 U.S. at 12; (2) whether the misconduct is isolated or extensive, *see Donnelly*, 416 U.S. at 646; (3) whether the misconduct is deliberate, *see id.* at 647; (4) whether the prosecutor manipulated or misstated the evidence, *see Darden,* 477 U.S. at 182, and *Berger,* 295 U.S. at 84-85; (5) the strength of the competent proof to establish the guilt of the accused, *see Darden,* 477 U.S. at 182; (6) whether the misconduct was objected to by defense counsel, *see id.* at 182-183 & n. 14, and *Young,* 470 U.S. at 13; and (7) whether a curative instruction was given by the trial

---

*States,* 487 U.S. 250, 254-55 (1988) (dismissal of indictment for prosecutorial misconduct under the supervisory power of the federal court is appropriate "only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations").

judge, *see Darden,* 477 U.S. at 182.[10]

Furthermore, in this federal habeas corpus proceeding challenging a state conviction, the Court may not grant relief based on a constitutional trial error committed during the state trial unless that error "had a substantial and injurious effect or influence in determining the jury's verdict." *See Calderon v. Coleman,* 525 U.S. 141, 145 (1998) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993) (wherein the standard of review enunciated in *Kotteakos v. United States,* 328 U.S. 750 (1946), a federal direct review case, was first applied to a federal collateral review proceeding under 28 U.S.C. § 2254)). Any constitutional error based on a claim of prosecutorial misconduct must meet the *Brecht* standard to warrant habeas corpus relief. *Gordon v. Kelly*, 205 F.3d 1340 (table), No. 98-1905, 2000 WL 145144, at **12 (6th Cir. Feb. 1, 2000) (unpublished); *Hensley v, McGinnis,* 188 F.3d 507 (table), No. 98-1675, 1999 WL 685932, at **3-4 (6th Cir. Aug. 25, 1999) (unpublished).

This Court has reviewed each of the prosecutor's closing argument and rebuttal statements cited by petitioner as exceeding the bounds of propriety and agrees with the Ohio Court of Appeals' determination that, although some of the prosecutor's comments were "inappropriate and inexcusable," they were not so egregious as to have deprived petitioner of a fair trial and, in any event, did not have a substantial damaging effect or influence on the jury's verdict.

First, as the Ohio Court of Appeals reasonably found, many of the prosecutor's challenged remarks–such as those pointing out the "sexual overtones" contained in some of petitioner's photographs and cautioning the jury to be careful in looking at and handling two pieces of evidence that showed bodily fluid leakage from petitioner's manipulation of the corpses' body parts–were not improper to the extent they were based on evidence placed in the record for the jury's consideration and were relevant to the jury's determination of petitioner's guilt or innocence under Ohio's

---

[10]*See also Gillard v. Mitchell,* Nos. 03-4261, 03-4322, 2006 WL 1083599, at *11 (6th Cir. Apr. 26, 2006) (to be published at 445 F.3d 883) (citing *Bowling,* 344 F.3d at 512-13); *Farmer v. Hofbauer,* 1 Fed.Appx. 372, 377-78 (6th Cir. Jan. 10, 2001) (not published in Federal Reporter); *Givens v. Yukins,* 238 F.3d 420 (table), No. 98-2429, 2000 WL 1828484, at **6-7 (6th Cir. Dec. 5, 2000) (unpublished); *Gordon v. Kelly,* 205 F.3d 1340 (table), No. 98-1905, 2000 WL 145144, at **7 (6th Cir. Feb. 1, 2000) (unpublished); *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.) (citing *Serra v. Michigan Dep't of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993), *cert. denied,* 510 U.S. 1201 (1994)), *cert. denied,* 522 U.S. 1001 (1997).

abuse of corpse statute.

There is little risk, if any, that the jury was inflamed against petitioner by the prosecutor's remarks about the two evidentiary items as showing signs of bodily fluid leakage. Moreover, to the extent the jury could have inferred from the prosecutor's challenged remarks that petitioner "derived some fetishistic sexual pleasure from the bodies photographed," the risk of prejudice was cured when the trial court gave the following cautionary instruction to the jury immediately after defense counsel lodged an objection to the prosecutor's "sexual overtones" characterizations:

> What counsel says in their closing is not evidence. The evidence on which you decide this case[] is based upon what you hear from the mouths of witnesses sitting on this witness stand, plus the exhibits which have been admitted during the course of the trial, plus any agreed or stipulated facts.

> Now, you are the sole determiner of the evidence in this case. You determine what happened.

> In addition, counsel may make reasonable inferences based upon what the evidence is. Since you are [the] determiner of what the evidence is, I'm going to let you determine whether or not they are, in fact, making reasonable inferences based upon what the evidence is.

> Remember, you will decide the case on what you heard from the mouths of witnesses sitting on the witness stand, plus the exhibits which have been admitted during the course of the trial.

(Doc. 5, Tr. 1484-85).

In any event, given that the jury acquitted petitioner on the charge involving victim Eugene White (renumbered Count One) (*see* Doc. 5, Tr. 1504), whose photograph was referred to by the prosecutor as depicting a "grotesque striptease" and as exposing the victim's genitals (*id.*, Tr. 1388), the Court concludes that to the extent the prosecutor's sexual references were inflammatory, they did not have a substantial and injurious effect in determining the jury's verdicts in this case under *Brecht*.

Second, although not addressed by the Ohio Court of Appeals, the Court finds

26

no merit to petitioner's claim that he was denied a fair trial to the extent the prosecutor may have improperly commented on evidence outside the record by (1) on one occasion, gesturing to unidentified people in the gallery and referring to them as the victim's families; and (2) on another occasion, mentioning that a county clerk would "be dealt with" administratively for doing "some things with the photographs that he should not have done." This alleged misconduct, which was not objected to by defense counsel, was isolated; does not appear to have been deliberate; had little, if any, tendency to mislead the jury; and was not sufficiently inflammatory to create a risk of juror prejudice against petitioner.

Third, it was reasonable for the state appellate count to conclude that petitioner was not deprived of a fair trial by the prosecutor's use of inflammatory words–i.e., "disgusting," "repulsive," "revolting," and "horrific"–to describe the depictions of most of the corpses as reflected in the photographs introduced into evidence at trial. The alleged misconduct, which was not objected to by defense counsel, was extensive and most likely deliberate. However, because the photographs were introduced into evidence for the jurors to evaluate on their own, it is unlikely that the jury was misled by, or otherwise prejudiced against petitioner as a result of, the prosecutor's use of inflammatory language in describing them. Indeed, as discussed above in addressing petitioner's claim stemming from the prosecutor's sexual references, *see supra* pp. 26-27, petitioner is unable to demonstrate that the alleged misconduct prejudicially impacted the jury's verdicts in this case, given that the jury acquitted petitioner on the charge involving victim Eugene White, whose photograph was referred to by the prosecutor as both "repulsive" and "revolting" (*see* Doc. 5, Tr. 1388).

The most egregious conduct, which the Ohio Court of Appeals found to be "highly inappropriate," involved three comments by the prosecutor during rebuttal argument that tended to denigrate the role of defense counsel. As the state appellate court concluded, two of the challenged comments, which included the inflammatory remark about defense counsel's "audacity" in referring to petitioner's "bullshit project as art," could have led jurors to believe that defense counsel may have "fabricat[ed] a false artistic purpose behind [petitioner's] behavior" at the county morgue. (*See* Doc. 6, Ex. V, p. 28). Nevertheless, despite the impropriety of these comments, it was reasonable for the court to conclude that when viewed in the context of the entire trial, they did not deprive petitioner of a fair trial.

Although the prosecutor exceeded the bounds of propriety, his remarks were made in response to comments by petitioner's counsel in closing argument to the effect that "we may not approve of the creative project that Mr. Condon had, but the bottom line is that this is a young man who is, in fact, an artist," and "[h]e didn't think that there was a heedless indifference to a body by allowing this young photographer

27

and artist – I should not call him a photographer, I should call him an artist because that is what he is and that's the title that he is deserving of and that's the reputation he earned." (*See* Doc. 5, Tr. 1414-15, 1429).[11] Moreover, upon defense counsel's objection to the prosecutor's most incendiary remark about defense counsel's referring to "this bullshit project as art," the trial court immediately issued a curative instruction, cautioning the jury in pertinent part as follows:

> *What counsel says to you in final argument is not evidence.* The evidence on which you will consider this case and what you will decide this case on is what you heard from the mouths of witnesses sitting on that witness stand, plus the exhibits, plus any agreed or stipulated facts.

> *Now, as I told you before, you are the sole determiner of what the evidence is. You determine what happened in this case.* They are allowed to make reasonable inferences based upon what the evidence is. *Since you determine what the evidence is, you are the sole trier of the facts and I will also let you determine whether or not they are, in fact, making reasonable inferences based upon what the evidence is.*

> Again, remember, you will decide this case on what you heard from the mouths of the witnesses sitting on that witness stand, plus any exhibits, plus any agreed or stipulated facts.

(*Id.,* Tr. 1474-75) (emphasis added).

Finally, defense counsel's closing argument reflected a defense which was not predicated on the theory that petitioner's photography of corpses at the county morgue was justified by an artistic purpose. Instead, it appears the defense position was premised on the theory that petitioner was granted authorization by officials at the county coroner's office to take the photographs upon which the criminal charges were based, or at worst was a "scapegoat" who should not be found guilty of abusing corpses when the public officials who approved his project were not charged with any criminal offense. (*See id.,* Tr. 1405-38). Therefore, it is highly unlikely that the

---

[11]Although the Ohio Court of Appeals found that the prosecutor's challenged remarks were made in response to the "antagonistic atmosphere" created by Tobias's counsel in closing argument, it was petitioner's counsel who in closing argument made the comments referring to petitioner as an "artist."

prosecutor's challenged remarks impugning defense counsel's characterization of petitioner's photography project at the morgue as "art" had little, if any, prejudicial impact on the jury's consideration of petitioner's guilt or innocence under Ohio's abuse of corpse statute.

Of most concern to this Court is the prosecutor's remaining remark, which could have misled the jury to believe that defense counsel had coached defense witness Ernie Waits to give false testimony at trial on petitioner's behalf. Waits testified on direct examination in support of the defense theory that the coroner's office was informed of his and petitioner's personal photography projects from the outset during meetings held with Terry Daly and Dr. Parrott, among others, and that he was "never told by Mr. Daly, Dr. Parrott or anyone from the coroner's office that specifically these projects could not be done" after the autopsy-training video project was placed "on hold" due to budgetary concerns. (*See* Doc. 5, Tr. 1239-56). On Waits' cross-examination, the prosecutor elicited testimony from Waits that contrary to his testimony on direct examination, he previously had told the police that his and petitioner's projects could be done only "after the documentation of the procedure for training" and that "anything that came subsequent to [the training video] would have to go through forms, some form of approval stages and . . . [the] right of refusal of any image[] that was captured." (*See id.,* Tr. 1264-67).

Certainly, as the Ohio Court of Appeals found, the prosecutor's remark insinuating that Waits' testimony may have changed over time due to coaching by defense counsel was "entirely inappropriate." (*See* Doc. 6, Ex. V, p. 29). However, when viewed in the context of the entire trial, the Court cannot say it was unreasonable for the Ohio Court of Appeals to conclude that this one passing comment failed to rise to the level of a due process violation.

The comment was isolated and did not constitute a direct assault on the propriety of defense counsel's actions in this case. In contrast, as the Ohio Court of Appeals reasonably found, "for the most part, the prosecutors focused on the evidence presented during the state's case and what the prosecutors perceived as the weaknesses in [petitioner's] case." (*See id.,* p. 31). Defense counsel did not object to the remark when it was made. However, as a result of other objections lodged by defense counsel during the prosecutor's rebuttal argument, the jury was made well aware through curative instructions issued on two occasions by the trial court that counsel's arguments were not evidence and that the jury, as the sole trier of fact, was to consider petitioner's guilt or innocence solely on the basis of the evidence

presented at trial.

In any event, even assuming, *arguendo,* Waits' testimony for the defense was undermined by the prosecutor's improper insinuation of coaching by defense counsel, petitioner has not demonstrated that such error had a substantial injurious effect in determining the jury's verdicts in this case. Although Waits' testimony was helpful to the defense in some respects, Waits did state that he and Condon were informed that the "best case scenario" for their pursuing their projects at the morgue would be "a corpse that was unclaimed and unidentified" and that there were "very specific things that [they] would have to be mindful of as far as capturing images." (Doc. 5, Tr. 1242).[12] Waits also indicated that the "authorization" given for their individual projects at the morgue was granted on a "quid pro quo" basis in exchange for their work in producing the autopsy-training video, which was ultimately placed "on hold" and which Waits conceded on cross-examination was the "primary focus" of their discussions with the coroner's office. (*See id.*, Tr. 1246-47, 1264-65).

In addition, Waits, who was not present when petitioner visited the morgue in August 2000, failed to provide any testimony to rebut Terry Daly's trial testimony that petitioner was only authorized during those visits to take photographs subject to Dr. Parrott's approval of corpses undergoing autopsies for the sole permissible purpose of determining "lighting and camera angles." (*See id.*, Tr. 951-53, 1031-32). Finally, Waits testified that he decided not to proceed with his personal project "at the time [petitioner] supposedly started his project," and that he would not have continued to contact the coroner's office after he "was told that the [autopsy-training video] project was going to be put on hold." (*Id.*, Tr. 1259-61). It appears from this evidence that Waits was not privy to the events that occurred at the morgue after the training video project was canceled. Therefore, he was unable to respond to the following critical testimony against petitioner, which was provided by Daly during both direct and cross-examination at trial:

> A. *I think the last time I saw Mr. Condon it was probably October [of 2000] and he asked about his project and I said, you could keep trying.*

---

[12]It is noted further that Waits did not provide any testimony to rebut Terry Daly's testimony at trial that prior to the incidents in question, Waits and Condon also were both informed of the prosecutor's office opinion that "it would be okay to do [the autopsy-training] video" subject, however, to either "submitt[ing] it to the Court" to be declared a public record or getting the "permission of next of kin." (*See* Doc. 5, Tr. 948, 1021).

*If you want to keep trying to do it. It's going to be too difficult getting next of kin approval and that was it.* That was the last time I talked to him.

Q. Did you tell him the project was not going to happen?

A. I told him the money was not in this year's budget and probably not the next year's budget.

Q. And did he ask to come back into the morgue and take more pictures?

A. No, he still wanted to do his project, but he didn't ask if he could come and do his pictures.

(*Id.*, Tr. 954-55) (emphasis added).

Q. And you had no further discussions with Mr. Condon about hi[s] going forward with the coroner's project and his own at the same time?

A. He asked several times about his and there was not a whole lot we could do about it because, number 1, we were not going with ours at the time and, number 2, we didn't have any permission to do it.

Q. Well, again, when you use the word "permission" you are still talking about the question about authority as he would get the opinion from the prosecutor's office?

A. Well, that and next of kin.

(*Id.,* Tr. 1020-21).

Accordingly, in sum and for the foregoing reasons, the Court concludes that petitioner has not demonstrated he is entitled to habeas corpus relief based on any of his claims of prosecutorial misconduct that are alleged in Ground One of the petition.

## B. Petitioner Is Not Entitled To Habeas Relief Based On His Claim Alleged In

31

### Ground Two Of A Violation Of His First Amendment Rights

In Ground Two of the petition, petitioner alleges that the indictment and his resulting convictions were obtained in violation of his First Amendment rights, because his photographs of morgue corpses "were created for artistic purposes." (Doc. 1, p. 5).

Petitioner first raised this claim when he moved to dismiss the indictment on First Amendment grounds.  (*See* Doc. 6, Ex. I). The trial court denied the motion, summarily reasoning on the record at a pretrial hearing that "at issue is the alleged illegal and unauthorized conduct of the defendants which gave rise to these photos." (*Id.,* Ex. L; *see also* Doc. 5, Tr. 147).

Petitioner challenged the trial court's ruling on direct appeal.  The Ohio Court of Appeals, which was the last state court to issue a reasoned decision addressing the merits  of this claim, rejected petitioner's assignment of error, reasoning in relevant part as follows:

> Initially it is important to make clear that this case is not about the images themselves.   R.C. 2927.01(B) is not a blanket proscription against taking pictures of dead people.  If it were, the statute would be content-based and unconstitutional.  The First Amendment prohibits the government from restricting expression because of its message, ideas, subject matter, or content.  See *Hudgens v. Natl. Labor Relations Bd.* (1976), 424 U.S. 507. . . .

> Had Condon been able, therefore, to devise a means of obtaining either legal authorization or the consent *causa mortis* of his subjects (or perhaps even the posthumous consent of their families), he would have been free to express himself by taking the pictures that he did.  Condon, however, did not receive authorization, nor did he receive the consent of the families of those whose bodies he chose to photograph.   After consulting with the prosecutor's office, morgue officials denied his request for permission to use morgue bodies for his "life cycles" project.  There is absolutely no evidence to suggest that he ever approached the families of the deceased, perhaps because he feared the sharpness of their reply.  Rather, Condon took it upon himself, knowing that he did not have permission, to enter the morgue without authorization and to turn

32

it into his photography studio, randomly selecting corpses and using their lifeless forms for his subjects, even going so far as to plant symbolic props on several in an apparent effort to enhance his artistic message. It was this conduct by Condon–the unauthorized treatment of bodies of others' loved ones as objects to be photographed for his personal art project–that the state sought to punish.

Contrary to Condon's argument, the First Amendment did not grant him a right to abuse a corpse for the purpose of his art. (Employing the same logic, Condon would have a perfect right to dig up bodies from their graves if he decided his next project was "death cycles," a study of the human body decomposing.) Concededly, the United States Supreme Court has recognized that the protection of the First Amendment "does not end at the spoken or written word *** [and] that conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Texas v. Johnson* (1989), 491 U.S. 397, 404 . . ., quoting *Spence[] v. Washington* (1974), 418 U.S. 405, 409. . . . But the Court has also recognized that 'virtually any prohibited conduct can be performed for an expressive purpose–if only expressive of the fact that the actor disagrees with the prohibition." *Barnes v. Glen Theatre Inc.* (1991), 501 U.S. 560, 576 . . . (Scalia, J., concurring). Consequently, the Court has rejected the view that a "'limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends to express an idea.'" *Johnson,* supra*, at 404, . . . quoting *United States v. O'Brien* (1968), 391 U.S. 367, 376. . . .

Moreover, even conduct that is sufficiently imbued with communicative elements to fall under the First Amendment is subject to time, place, and manner restrictions. As this court has noted, "The First Amendment has never conferred an absolute right to engage in expressive conduct whenever, wherever, or in whatever manner a speaker may choose." *Cincinnati v. Thompson* (1994), 96 Ohio App.3d 7, 15-16, 643 N.E.2d 1157, citing *Greer v. Spock* (1976), 424 U.S. 828, 836, . . . and *Adderley v. Florida* (1966), 385 U.S. 39, 48. . . .

In *Thompson,* this court held that abortion protestors had no constitutionally protected right to trespass upon private property to

33

express their views. Similarly, this court has held that a person, although he or she may verbally express disapproval, and may even curse at a police officer, has no right to obstruct the officer from giving parking tickets by running ahead of the officer to feed a meter. See *State v. Stayton* (1998), 126 Ohio App.3d 158, 709 N.E.2d 1224. And, more recently, this court has held that an adult male may be convicted of disorderly conduct by following a young teenage girl around a health facility, frightening her by making sexually inappropriate comments. See *State v. Bailey* (June 21, 2002), 1st Dist. No. C-010641. In each of these cases, we rejected the argument that the First Amendment rendered the proscribed behavior immune from criminal prosecution.

As a further point of clarification, it should be pointed out that this case is not concerned solely with photographing dead people without the permission of the next of kin. A photojournalist may take pictures of the dead–on the battlefield, for example, or as the result of a public accident or tragedy, such as the horrible spectacle of death surrounding the World Trade Center–to document a newsworthy event. It is generally understood that such photographic documentation is a form of protected speech and a part of the freedom of the press that cannot subject the photographer to either criminal or civil liability, no matter how shocking to the sensibilities of the family. See *Bremmer v. Journal-Tribune Publishing Co.* (1956), 247 Iowa 817, 76 N.W.2d 762. As noted by Prosser, "It seems to be generally agreed that anything visible in a public place can be recorded and given circulation by means of a photograph, to the same extent as a by a written description, since this amounts to nothing more than giving publicity to what is already public and what anyone present would be free to see." Prosser, Handbook of the Law of Torts (4 Ed. 1971), Section 117, 811.

Here, however, the corpses were not in a place open to public inspection. A morgue is not a lending library or a museum. It is a place of private repose, not of public display. The public expects those in charge to ensure that the bodies of their loved ones are not unnecessarily disturbed or gratuitously handled or examined. Condon did not merely document photographically what the public was free to see, but instead entered the morgue without permission and took pictures of what the public was not allowed to see. Some of the bodies he even manipulated and posed with

props for the sake of his artistic enterprise.

And, finally, it should be emphasized that we are not concerned with the act of merely having pictures of corpses in one's possession. An art museum or gallery does not, for example, abuse a corpse by hanging a picture of it for public display, no matter how grisly or offensive the image. This case is about the manner in which Condon took the photographs, and his treatment of the corpses in doing so; it is no way a prosecution based upon the message he sought to express.

(Doc. 6, Ex. V, pp. 8-12) (footnote omitted).[13]

This Court agrees with the Ohio Court of Appeals' determination that petitioner was not protected by the First Amendment from criminal prosecution on abuse of corpse charges stemming from his unauthorized use of morgue corpses as models for the expression of an artistic idea in his photographic "life cycles" project.

As the Ohio Court of Appeals pointed out (*see id.*, p. 9), although the First Amendment literally forbids only the governmental abridgment of free "speech," the United States Supreme Court has long recognized that the protection of the First Amendment "does not end at the spoken or written word" and that "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Texas v. Johnson,* 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington,* 418 U.S. 405, 409 (1974)). By the same token, as the Ohio Court of Appeals also pointed out (*see* Doc. 6, Ex. V, p. 10), the Supreme Court has refused to adopt the position "that an apparently limitless variety of conduct can be labeled 'speech' [within the First Amendment's protection] whenever the person engaging in the conduct intends thereby to express an idea." *See United States v. O'Brien,* 391 U.S. 367, 376 (1968).

In *O'Brien,* the Supreme Court stated that even where "the alleged communicative element in [a person's] conduct is sufficient to bring into play the First

---

[13]In the omitted footnote, the Court of Appeals stated that "even a photojournalist could be found guilty of abusing a corpse–even one found in a public place–under R.C. 2927.01 if he or she manipulated the body for the purpose of heightening the visual effect of a photograph." (Doc. 6, Ex. V, p. 11 n.1).

Amendment, it does not necessarily follow that [such conduct] is constitutionally protected activity." *Id.* It is well-settled under Supreme Court precedents that where "'speech' and 'nonspeech' elements are combined in a course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Johnson,* 491 U.S. at 407 (quoting *O'Brien,* 391 U.S. at 376).

In *Johnson,* 491 U.S. at 406, the Supreme Court explained: "The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." Therefore, only those laws that are "directed at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires." *Id.* (quoting *Community for Creative Non-Violence v. Watt,* 703 F.2d 586, 622-23 (D.C. Cir. 1983) (Scalia, J., dissenting), *rev'd sub nom. Clark v. Community for Creative Non-Violence,* 468 U.S. 288 (1984)). In those cases where there is an important or substantial governmental interest in regulating the non-speech element of the conduct, which is unrelated to the suppression of free expression, a more lenient standard of review as set forth in *O'Brien* is to apply. *See id.* at 407. Under this standard, the government regulation is "sufficiently justified" if (1) "it is within the constitutional power of Government;" (2) "it furthers an important or substantial governmental interest;" (3) "the governmental interest is unrelated to the freedom of expression;" and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien,* 391 U.S. at 377. The Supreme Court has suggested that this more lenient test "in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions" on speech in a public forum. *Johnson,* 491 U.S. at 407 (quoting *Clark,* 468 U.S. at 298).[14]

In this case, the Court initially concludes that Ohio's abuse of corpse statute is content-neutral, or in other words, is not aimed at the suppression of expression or the communicative nature of conduct. Specifically, petitioner was tried under the following felony provision set forth in Ohio Rev. Code § 2927.01(B): "No person, except as authorized by law, shall treat a human corpse in a way that would outrage

---

[14]Under the line of cases addressing "time, place and manner restrictions" on public expression, the Supreme Court has held that such restrictions "are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels of communication of the information." *Clark,* 468 U.S. at 293 (and cases cited therein).

reasonable community sensibilities."  On its face, this provision constitutes a regulation that is directed only at non-speech, as opposed to expressive, conduct. Therefore, at best, petitioner can only argue that because he sought to express an artistic idea by using morgue corpses as models in his photography project, the course of conduct for which he was indicted and convicted involved a speech as well as a non-speech element, which is subject to review under the more lenient standard enunciated by the Supreme Court in *O'Brien* for evaluating First Amendment claims. *Cf. O'Brien,* 391 U.S. at 377-82 (involving conviction of person who burned his Selective Service registration certificate as part of a war protest, under federal statute which was enacted "to insure the continuing availability of issued certificates" as a means to "classify and conscript manpower for military service"); *Egolf v. Witmer,* 421 F.Supp.2d 858, 861-62, 867-70 (E.D. Pa. 2006) (involving convictions under state lewdness statute of persons who participated in a public protest against the president and the Iraq war by "recreating nudity 'as closely as possible'" in an attempt to recreate a photograph taken at the Abu Ghraib prison in Iraq); *Greenberg v. Woodward,* No. Civ.A. 01-CV-10166-G, 2001 WL 1688902 (D. Mass. Dec. 12, 2001) (unpublished) (involving conviction of a prior professor, who had been banned from the college president's office, under state statute prohibiting trespassing on college property), *aff'd*, 64 Fed.Appx. 252 (1st Cir. May 28, 2003) (not published in Federal Reporter).

Under the first prong of *O'Brien*'s four-part test, there is no question that it was within the constitutional power of the Ohio legislature to enact and enforce its abuse of corpse statute.  *Cf. Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 569 (1991) (in a case involving a First Amendment challenge to a public indecency statute, the Supreme Court acknowledged that the states have the authority under their "traditional police power" to enact and enforce statutes which "provide for the public health, safety and morals").

Second, the statute furthers an important or substantial government purpose, long recognized under common law,  to ensure the dead are treated in a manner that would not shock or outrage the public's moral standards of human decency.  *See generally* John S. Herbrand, Annotation, *Validity, Construction, and Application of Statutes Making it a Criminal Offense to Mistreat or Wrongfully Dispose of Dead Body,* 81 A.L.R.3d 1071, §2(a) (1977); *State v. Vestal,* 611 S.W.2d 819, 821-22 (Tenn. 1981) ("At common law, . . . the substance of the offense was the degrading handling of a human body which offended the public's sense of decency and morals,

or which exposed the public to the danger of contagious diseases or contamination of drinking water.") (and state cases cited therein).  The state's interest in support of the restriction was plainly implicated here in light of petitioner's actions in photographing after posing, manipulating, or placing props on or around the bodies of, the corpses that he was found guilty of grossly abusing for purposes of his personal photography project.  (*See* Doc. 5, Tr. 545-48, 1388- 94).[15]

Third, as discussed above, *see supra* pp. 36-37, the State has an interest unrelated to the suppression of expression in ensuring that the dead are treated in a manner that will not offend the public's sense of decency and morals.  As found by the Ohio courts, petitioner was prosecuted for his "illegal and unauthorized conduct" towards the morgue corpses, not because he sought to express an artistic idea about the life cycle by way of photographs of dead people.  As the Ohio Court of Appeals apparently recognized in determining that the "First Amendment did not grant [petitioner] a right to abuse a corpse for the purpose of his art" (Doc. 6, Ex. V, p. 9), petitioner's argument that he committed the acts prohibited by Ohio's abuse of corpse statute in order to express an artistic idea does not change this conclusion.  *Cf. Egolf,* 421 F.Supp.2d at 872 (citing *Barnes,* 501 U.S. at 570-71, which upheld the state's interest in preventing public nudity "whether or not it is combined with expressive activity").

Finally, under the fourth *O'Brien* factor, it appears that the restrictions which are contained in Ohio's abuse of corpse statute are no greater than necessary to fulfill the State's interest in protecting community standards of decency and morals with respect to the treatment of human corpses.  The statute exempts from criminal prosecution conduct that is authorized by law, such as mandatory autopsies and

---

[15]Specifically, the convictions upheld by the state courts (renumbered Counts Two, Six, Seven, Nine, Ten, Eleven and Twelve) stem from petitioner's mistreatment of seven morgue corpses–John Brady, Thomas Senteney, Jonathan Frith, Debbie Beckman, Adam Richardson, Barbara Sowards and Christina Folchi.  In contrast, it appears from the record that in addition to his acquittal on a count involving deceased victim Eugene White (renumbered Count One), petitioner was acquitted (or had his conviction voided) on charges stemming from photographs allegedly taken by co-defendant Tobias of victims Ulysses Greene, Toby Malakoff, Jeffrey Bowles and Perry Melton at the scenes of their deaths or at the morgue (renumbered Counts Three, Four, Five and Eight); the State apparently sought to establish petitioner's guilt on those four counts based on the fact that the negatives for these photographs were found in petitioner's studio.  (*See* Doc. 5, Tr. 1395-98, 1506, 1507, 1511; *see also* Doc. 17, Ex. B; *State v. Condon,* 808 N.E.2d 912 (Ohio Ct. App. 2004)).

exhumations of bodies pursuant to court orders. *See* Ohio Rev. Code § 2927.01 (1974 Committee Comment to H 511). Moreover, a person cannot be found guilty under the statute governing the felony offense of gross abuse of a corpse unless the State establishes beyond a reasonable doubt that the person acted recklessly and that the charged conduct "would outrage reasonable community sensibilities." *See* Ohio Rev. Code § 2927.01(B); *see also State v. Glover,* 479 N.E.2d 901, 903 (Ohio Ct. App. 1984).

As the Court of Appeals explained, the statute does not prohibit a museum or art gallery from possessing or displaying pictures of corpses "no matter how grisly or offensive the image[s]" are. (Doc. 6, Ex. V, pp. 11-12). The statute also does not prohibit the photographic documentation of dead people in a "public place," such as a battlefield or scene of an accident or other public disaster, even without the permission of next of kin . (*See id.,* pp. 10-11). The Ohio Court of Appeals pointed out further that if petitioner had obtained "either legal authorization or the consent *causa mortis* of his subjects (or perhaps even the posthumous consent of their families), he would have been free to express himself by taking the pictures that he did." (*Id.,* pp. 8-9). The "no greater than necessary" test certainly was met in applying the statute to prohibit the conduct charged in this case–i.e., entering the county morgue and using morgue corpses as "models" for a personal photographic art project without obtaining official authorization for such project from the government or the consent of the victims' families. *Cf. Egolf,* 421 F.Supp.2d at 872-73.

Accordingly, in sum, petitioner has not demonstrated he is entitled to habeas corpus relief based on his claim alleged in Ground Two of the petition that his indictment and his convictions and sentences that were upheld by the state courts, *see supra* p. 38 & n.15, constituted a violation of his First Amendment rights.

### C. Petitioner Is Not Entitled To Relief Based On His Fourth Amendment Claim Alleged In Ground Three Of The Petition

In Ground Three of the petition, petitioner alleges that the trial court committed constitutional error when it overruled his motion to suppress evidence seized from his studio based on a search warrant that was not supported by probable cause, in violation of the Fourth Amendment's protection against unreasonable searches and seizures. (Doc. 1, p. 6). Respondent contends in the return of writ that the Supreme

Court's decision in *Stone v. Powell,* 428 U.S. 465, 494-95 (1976), precludes federal habeas review of this ground for relief.  (Doc. 4, pp. 24-25).

As respondent has argued, federal habeas courts are prohibited from addressing the merits of Fourth Amendment claims brought by state prisoners if the petitioner had a full and fair opportunity to litigate the claim in state court and the presentation of the claim was not thwarted by any failure of the State's corrective process.  *Stone*, 428 U.S. at 494-95.

To determine whether the petitioner's claim is subject to review, a federal habeas corpus court must make two distinct inquiries: (1) whether the State has provided a procedural mechanism through which, in the abstract, petitioner could raise a Fourth Amendment claim; and (2) whether petitioner's presentation of the claim was in fact frustrated because of a failure of that mechanism.  *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir.), *cert. denied,* 459 U.S. 948 (1982); *see also Machacek v. Ohio,* 213 F.3d 947, 952 (6th Cir. 2000), *cert. denied,* 531 U.S. 1089 (2001).

Ohio provides an adequate procedural mechanism for the litigation of Fourth Amendment claims in the form of a pretrial motion to suppress pursuant to Ohio R. Crim. P. 12, and a direct appeal as of right from an order denying a motion to suppress pursuant to Ohio R. App. P. 3 and 5.  Discretionary review by the Ohio Supreme Court is not an additional requirement for ensuring full and fair litigation of a Fourth Amendment claim in Ohio.  Therefore, under the first inquiry, Ohio's mechanism for the resolution of Fourth Amendment claims, in the abstract, presents the opportunity to raise such claims.  *Id.*

Under the second inquiry, petitioner has not shown that there was a failure of the State's procedural mechanism which frustrated the presentation of his Fourth Amendment claim in the Ohio courts.  Petitioner presented his Fourth Amendment claim to the trial court by way of a suppression motion. (*See* Doc. 6, Ex. E).  He also challenged the trial court's denial of his motion to suppress on direct appeal to the Ohio Court of Appeals and Ohio Supreme Court.  (*Id.,* Exs. S, BB).

Before ruling on petitioner's suppression motion, the trial court permitted counsel to file written briefs and held a hearing on April 10, 2001 where counsel was allowed to present oral arguments and introduce the search warrant and supporting affidavit with attached exhibits on the record for the court's review. (Doc. 5, Tr. 76-

88).  The trial court later overruled the motion to suppress from the bench, reasoning that the defendants were not entitled to an evidentiary hearing on the matter because they had "failed to meet the initial burden of proof to demonstrate that the affidavit [in support of the search warrant] contains false or contradictory statements." (*Id.,* Tr. 109-110).  The court further found that "the affidavit does not contain false or contradictory statements" and established probable cause that evidence would be found at petitioner's place of business, as well as that a crime had occurred. (*Id.,* Tr. 110).

Petitioner was permitted to challenge the trial court's ruling on direct appeal. (*See* Doc. 6, Ex. S, pp. 14-18).  The Ohio Court of Appeals rejected petitioner's claim of error, finding that petitioner had presented "insufficient evidentiary material to support his claim that the officer requesting the [warrant] made a false statement either knowingly, intentionally or with a reckless disregard for the truth," and that "ample information existed to support a finding that there was probable cause for the issuance of a warrant." (*Id.,* Ex. V, pp. 15-16).  Moreover, the Ohio Supreme Court declined jurisdiction to hear the case, apparently because it was not persuaded by petitioner's memorandum in support of jurisdiction that the claim merited further consideration. (*Id.,* Ex. DD).

Accordingly, upon review of the record, the Court concludes that the Supreme Court's *Stone* decision prohibits the re-litigation of petitioner's Fourth Amendment claim alleged in Ground Three of the petition, which petitioner had the opportunity to fully and fairly litigate in the state courts.

## D.  Petitioner Is Not Entitled To Relief Based On His Overbreadth And Vagueness Claim Alleged In Ground Four Of The Petition

In Ground Four of the petition, petitioner asserts his convictions under Ohio's gross abuse of corpse statute, Ohio Rev. Code § 2927.01(B), are invalid because the statute is unconstitutionally overbroad and vague on its face and as applied to him due the fact that the element of "community sensibilities" is undefined and thus fails to give "sufficient notice" of the conduct that is prohibited.  (Doc. 1, Addendum).

Petitioner first raised this claim in a pretrial motion to dismiss the indictment, which was denied by the trial court without opinion on April 10, 2001. (*See* Doc. 6,

Exs. B, D; *see also* Doc. 5, Tr. 90).

Petitioner asserted the claim again on direct appeal. The Ohio Court of Appeals, which was the only state court to render a reasoned decision addressing the merits of petitioner's void-for-vagueness and overbreadth claim, overruled petitioner's assignment of error, reasoning in pertinent part as follows:

*[]Vagueness*

In his fourth assignment of error, Condon challenges the constitutionality of R.C. 2927.01 by asserting it is impermissibly vague.  He argues that the plain language of the statute fails to provide adequate notice of the prohibited conduct.

A criminal statute violates the vagueness doctrine under the Due Process Clause of the Fourteenth Amendment if it does not contain "ascertainable standards of guilt.". . .  In *State v. Glover* (1984), . . . 479 N.E.2d 901, the Eighth Appellate District held that R.C. 2927.01(B) does provide such ascertainable standards.  The court observed that "[a] criminal statute is not void for vagueness simply because it requires a person to conform to an imprecise but comprehensible normative standard," but only when "it specifies no standard of conduct at all." ... The *Glover* court reasoned that while R.C. 2927.01 does not define every word within its ambit, the words contained in the statute–"treat," "human corpse," "way," "outrages," and "sensibilities"–are generally understood by persons of common intelligence. . . .  Thus, the court concluded that the statute is not void for vagueness and that it simply provides a standard of conduct based on contemporary community mores. . . .

The Second and Sixth Appellate Districts, it should be pointed out, have followed the *Glover* decision.  See *State v. Hopfer* (1996), . . . 679 N.E.2d 321; *State v. Gardner* (1989), . . . 582 N.E.2d 1014.  We are also persuaded by its reasoning.  Community mores concerning the proper treatment of a corpse are not, in our view, esoteric or otherwise difficult to discern.  Irrespective of one's religious views, and even if one is an atheist or an agnostic, it is almost universally understood that the bodies of the dead are to be treated with the utmost respect and in a manner that

42

will not inflict any more emotional pain upon "the wounded hearts of friends and mourners.". . . Indeed, there is in human beings an ingrained sense that the dead are not to be trifled with. It is incredible that Condon would maintain that he had no inherent appreciation that his treatment of the corpses violated community mores. Aside from principles of fundamental decency, the fact that the project had been rejected by the coroner's office should have alerted him that use of the county morgue for his art project had been officially disapproved. To be sure, the unauthorized manner with which he then proceeded indicates that he well understood that his use of the corpses as art objects was contrary to societal rules of accepted behavior.

Based upon the foregoing analysis, we conclude that the terms of R.C. 2927.01(B) are sufficiently explicit to provide notice of what conduct is prohibited under the statute. Accordingly, we hold that R.C. 2927.01(B) is not unconstitutionally vague.

## []Overbreadth

Also, in his fourth assignment of error, Condon argues that R.C. 2927.01 is capable of having a chilling effect because its reference to community mores, without further delineation, may lead citizens to steer clear of permitted behavior. The argument is not fully developed and is treated as ancillary to Condon's other arguments that R.C. 29[2]7.01 inhibits free speech and is impermissibly vague. As we have already discussed, the statute is content-neutral and designed to target a person's conduct in treating a corpse in a manner that the community finds not only wrong, but also outrageous. Such norms are generally understood. The average person rightfully appreciates that when he comes into contact with the dead, he must be unusually circumspect in their treatment and that any disrespectful behavior, if it goes too far, may run afoul of the law. The entire purpose of R.C. 2927.01 is to ensure that people, if they have not already learned, will act with reverence when dealing with bodies of the dead.

We cannot conceive, moreover, that R.C. 2927.01 has significant potential for inhibiting permitted behavior. The official comments to the

section make clear that it does not include conduct authorized by law, such as a mandatory autopsy or the exhumation of a dead body on court order.  Furthermore, the culpable mental state required for a violation of R.C. 2927.01(B) is recklessness. . . .  R.C. 2901.22(C) defines this mental state as follows: "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature."  This definition ensures against someone innocently or naively committing the crime of abuse of a corpse.  In order to convict, the state must prove that the defendant knew that his treatment of a corpse was likely to cause outrage to the community and that he nonetheless "perversely" disregarded that risk.

A court is under a duty to give a statute, whenever possible, a reasonable construction that will render it constitutionally definite. . . .  This being so, and given that the statute requires the culpable mental state of recklessness, we do not perceive that R.C. 2927.01 has a potential chilling effect on otherwise legal behavior.  We therefore reject Condon's argument that the statute is overly broad.

(Doc. 6, Ex. V, pp. 12-14) (state case citations omitted).

Overbreadth and vagueness are "logically related and similar," but distinct concepts. *See Kolender v. Lawson,* 461 U.S. 352, 358 n.8 (1983); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494-95 & n.6-7, 497 n.9 (1982); *see also Kreimer v. Bureau of Police,* 958 F.2d 1242, 1266 (3rd Cir. 1992).  The overbreadth doctrine developed as an exception to the traditional rule of standing prohibiting "a person to whom a statute may be constitutionally applied" from challenging "that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court."  *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796-98 (1984) (quoting *New York v. Ferber,* 458 U.S. 747, 767 (1982)).  A criminal statute may not be facially challenged as overbroad outside the limited context of the First Amendment.  *Schall v. Martin,* 467 U.S. 253, 268 n.18 (1984); *see also United States v. Salerno,* 481 U.S. 739, 745 (1987).  The Supreme Court has explained as justification for this limited exception:

"At least when statutes regulate or proscribe speech and when 'no

44

readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution,' . . . the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' . . . This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their right for fear of criminal sanctions provided by a statute susceptible of application to protected expression."

*Los Angeles Police Dep't v. United Reporting Publishing Corp.,* 528 U.S. 32, 38 (1999) (quoting *Gooding v. Wilson,* 405 U.S. 518, 520-21 (1972), in turn quoting *Dombrowski v. Pfister,* 380 U.S. 479, 486, 491 (1965)); *see also Taxpayers for Vincent,* 466 U.S. at 799 n.17.

In establishing the overbreadth doctrine, the Supreme Court has recognized the "risk that the doctrine itself might sweep so broadly that the exception to ordinary standing requirements would swallow the general rule." *Taxpayers for Vincent,* 466 U.S. at 799. Therefore, the Court has stated the doctrine is to be used "with hesitation" and "only as a last resort" when the overbreadth involved is "substantial." *Ferber,* 458 U.S. at 769 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973)). Although the concept of "substantial overbreadth" has not been reduced to an exact definition, the Supreme Court has held that "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for Vincent,* 466 U.S. at 800.

The requirement of substantial overbreadth applies when one seeks to challenge criminal as well as civil laws. *Ferber,* 458 U.S. at 772-73. In a case involving conduct-related regulation, the Supreme Court provided further guidance:

[T]he plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct–even if expressive–falls within the scope of otherwise valid criminal laws that

45

reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect–at best a prediction–cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe.

*Broadrick*, 413 U.S. at 615. Therefore, particularly in a case such as this involving a conduct-related criminal statute, the statute will not be invalidated on its face as overbroad unless the alleged overbreadth is not only real, but also substantial, "in relation to the statute's plainly legitimate sweep." *See id.; see also Ferber,* 458 U.S. at 770.

In distinction, the "void-for-vagueness" doctrine was developed to ensure penal statutes "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender,* 461 U.S. at 357 (and Supreme Court cases cited therein). Although actual notice is one of the concerns addressed by the doctrine, the more important aspect of it is the requirement that there must be "minimal guidelines" established to govern law enforcement. *Id.* at 358. "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* (quoting *Smith v. Goguen,* 415 U.S. 566, 575 (1974)). "The degree of vagueness that the Constitution tolerates–as well as the relative importance of fair notice and fair enforcement–depends in part on the nature of the enactment." *Flipside,* 455 U.S. at 498. When the challenged statute imposes criminal penalties, "the standard of certainty is higher." *Kolender,* 461 U.S. at 358 n.8 (citing *Winters v. New York,* 333 U.S. 507, 515 (1948)).

"Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the vagueness doctrine demands a greater degree of specificity than in other contexts." *Goguen,* 415 U.S. at 573. In this context, vagueness overlaps with overbreadth to the extent both doctrines address the danger created by a "penal statute susceptible of sweeping and improper application" of chilling the exercise of protected First Amendment activities. *NAACP v. Button,* 371 U.S. 415, 433 (1963); *Kreimer,* 958

F.2d at 1266; *see also Keyishian v. Board of Regents,* 385 U.S. 589, 609 (1967) ("Where statutes have an overbroad sweep, just as where they are vague, 'the hazard of loss or substantial impairment of those precious [First Amendment] rights may be critical,' . . . since those covered by the statute are bound to limit their behavior to that which is unquestionably safe.") (quoting *Dombrowski,* 380 U.S. at 486).  As the Supreme Court recognized in *Flipside,* in the First Amendment area, the "vagueness of the law affects" overbreadth analysis to the extent the court "should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Flipside,* 455 U.S. at 494 n.6.  In so noting, the Court stated it has long been recognized that ambiguous language causes people to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."  *Id.* (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372 (1964), in turn quoting *Speiser v. Randall,* 357 U.S. 513, 526 (1958)).

The difference between the two doctrines in the First Amendment area is subtle and is best explained by the Supreme Court in a footnote in *Flipside.*  The Court noted that one complains of vagueness in cases when a statute is challenged on the ground that it is unclear whether the statute regulates conduct "with some lawful purposes." *Flipside,* 455 U.S. at 497 n.9.  In distinction, one complains of overbreadth when a statute is challenged on the ground that it inhibits innocent conduct that has been found to fall within the statute's coverage.  *Id.*  In addition, the vagueness doctrine, unlike the overbreadth doctrine, further "seeks to ensure fair and non-discriminatory application of the laws, thus reflecting its roots in the due process clause." *Kreimer,* 958 F.2d at 1266.  The Supreme Court indicated in *Kolender,* which involved a vagueness challenge to a state criminal loitering statute found to implicate First Amendment rights and to vest "virtually complete discretion" in the hands of law enforcement for determining whether a suspect had satisfied the law's requirements, that such statute could be facially challenged by persons seeking to attack the enactment "as applied to conduct other than [their] own" based on the additional vagueness concern about the potential for "arbitrary enforcement" of the statute. *Kolender,* 461 U.S. at 358 & n.8.

Outside the limited First Amendment context, a vagueness challenge to a statute will not be upheld unless the enactment is found to be "impermissibly vague in all of its applications." *Flipside,* 455 U.S. at 495.  Moreover, a person who engages in conduct clearly proscribed by a statute that does not implicate First Amendment rights cannot claim the law is vague as applied to the conduct of others.  *Id.* & n.7.  In

*Flipside,* the Supreme Court noted:

> The rationale [for this due process vagueness standard] is evident: to sustain such a challenge, the complainant must prove that the enactment is vague "'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' . . . Such a provision simply has *no core.*"

*Id.* at 495 n.7 (quoting *Goguen,* 415 U.S. at 578, in turn quoting *Coates v. City of Cincinnati,* 402 U.S. 611, 614 (1971)).

In examining whether or not a state statute is too vague or overbroad to withstand a constitutional challenge, the court must construe the statute "as though it read[s] precisely as the highest court of the State has interpreted it." *Kolender,* 461 U.S. at 355 n.4 (quoting *Wainwright v. Stone,* 414 U.S. 21, 22-23 (1973), in turn quoting *Minnesota ex rel. Pearson v. Probate Court,* 309 U.S. 270, 273 (1940)); *see also Flipside,* 455 U.S. at 494 n.5 ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."). Moreover, in *Flipside,* the Supreme Court stated that in cases such as this involving a facial challenge to a statute both on overbreadth and vagueness grounds, the court must first determine whether the challenged law "reaches a substantial amount of constitutionally protected conduct." *Flipside,* 455 U.S. at 494. If it does not, then the overbreadth argument fails, and the court then must turn to the question whether the statute is void for vagueness. *Id.* Assuming the enactment does not implicate any constitutionally protected conduct under the First Amendment, petitioner will not prevail on his vagueness challenge unless he demonstrates that his conduct was not clearly proscribed by the statute being challenged and that the statute is "impermissibly vague in all its applications." *See id.* at 494-95.

Applying the foregoing principles enunciated by the Supreme Court to the instant case, this Court notes as an initial matter that as discussed earlier in addressing petitioner's First Amendment claim alleged in Ground Two of the petition, *see supra* pp. 36-38, Ohio's abuse of corpse statute is content-neutral and thus does not sufficiently implicate First Amendment concerns to support a facial challenge to the statute on overbreadth grounds. *See Schall,* 467 U.S. at 268 n.18. The State has an

48

important and substantial interest, which is neither related to nor directed at the suppression of expression, in ensuring that human corpses are treated in a manner that would not outrage the public's sense of decency and morals. Moreover, the Court has determined that the restrictions contained in Ohio's abuse of corpse statute are "no greater than necessary" to fulfill this substantial state interest. *See supra* pp. 38-39. The Court has further rejected petitioner's argument that First Amendment concerns are triggered here because the criminal acts charged in this case were committed by petitioner for the purpose of artistic expression. *See supra* pp. 37-39. Therefore, in the absence of any showing that the First Amendment is even implicated here, this Court fails to see how the overbreadth doctrine is applicable to the abuse of corpse statute challenged by petitioner in this case.

In any event, even assuming, *arguendo*, as the Ohio Court of Appeals apparently did, that an overbreadth analysis is applicable, petitioner has not shown that the alleged overbreadth is not only real, but also substantial "in relation to the [abuse of corpse] statute's plainly legitimate sweep." *See, e.g., Ferber,* 458 U.S. at 770; *Broadrick,* 413 U.S. at 615. In this case, the conduct subject to criminal sanctions–even if committed for an expressive purpose–"falls within the scope of [an] otherwise valid criminal law[] that reflect[s] legitimate state interests in maintaining comprehensive controls over harmful constitutionally unprotected conduct." *See Broadrick,* 413 U.S. at 615. Any risk that Ohio's abuse of corpse statute could be interpreted as deterring protected speech is "at best a prediction," and thus simply too speculative and remote to justify invalidating the statute as overly broad, thereby prohibiting the State from enforcing it against conduct that is within its power to proscribe. *Id.; cf. Ferber,* 458 U.S. at 756-57 (rejecting overbreadth challenge to state child pornography law despite the fact that it ran "the risk of suppressing protected expression").

In accordance with *Flipside,* 455 U.S. at 494, the Court next must consider petitioner's claim that Ohio Rev. Code § 2927.01(B) is unconstitutionally vague. Following the decisions handed down by the other Ohio appellate courts faced with the same issue, the Ohio Court of Appeals determined in this case that the terms of the statute are "sufficiently explicit to provide notice of what conduct is prohibited." (Doc. 6, Ex. V, p. 13). This determination comports with the Supreme Court precedents discussed above, *see supra* pp. 46-48, addressing void-for-vagueness claims.

Under Ohio Rev. Code § 2927.01(B), a person is guilty of gross abuse of a corpse if, except as authorized by law, he treats a human corpse "in a way that would outrage reasonable community sensibilities."  Because this provision neither specifies a culpable mental state as an element of the crime nor plainly indicates a purpose to impose strict liability, the Ohio courts, including the Ohio Court of Appeals in this case (*see* Doc. 6, Ex. V, p. 14), have construed the statute in accordance with Ohio Rev. Code § 2901.21(B) to require the State to prove as an element of the offense that the person acted recklessly, or in other words, "with heedless indifference to the consequences, . . . perversely disregard[ed] a known risk that his conduct [was] likely to cause a certain result or [was] likely to be of a certain nature," Ohio Rev. Code § 2902.22(C).  *See, e.g., State v. Hopfer,* 679 N.E.2d 321, 344 (Ohio Ct. App.), *appeal dismissed,* 673 N.E.2d 146 (Ohio 1996); *State v. Gardner,* 582 N.E.2d 1014, 1017 (Ohio Ct. App. 1989); *Glover,* 479 N.E.2d at 903.

Moreover, although the standard of "reasonable community sensibilities" contained in the statute is not defined with specificity, as the Ohio Court of Appeals understood (*see* Doc. 6, Ex. V, pp. 21), it constitutes a "comprehensible normative standard" derived from common law, which is generally understood and thus sufficiently clear to place a person of common intelligence on notice that unless authorized by law, reckless conduct that would offend well-established community mores regarding the respect and solemnity to be accorded the bodies of the deceased is prohibited.  *See Connally v. General Const. Co,* 269 U.S. 385, 391 (1926) (pointing out that "the decisions of the court, upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them . . . *or a well-settled common-law meaning, notwithstanding an element of degree in the definition as to which estimates might differ*") (emphasis added); *see also Flipside,* 455 U.S. at 495 n.7; *Goguen,* 415 U.S. at 578; *Coates,* 402 U.S. at 614. *Cf. Dougan v. State,* 912 S.W.2d 400, 402-04 (Ark. 1995) (in rejecting void-for-vagueness challenge to Arkansas's analogous abuse of corpse statute, the state supreme court construed "undefined words" contained in the statute by taking into account "the common law in force at the time the statute was passed," and referred to comments by drafters of the "closely follow[ed]" Model Penal Code "abuse of corpse" definition, to the effect that the "formulation is sufficiently broad to preclude gaps in coverage yet sufficiently precise in its statement of the ultimate question to provide

a meaningful standard of decision").[16]

As the state court of appeals reasoned in *Glover,* 479 N.E.2d at 904:

> In the area of obscenity the courts have consistently approved legislation that required a factfinder to apply contemporary community standards.... A similar application is available and constitutional in this context.

*Cf. Miller v. California,* 413 U.S. 15, 24 (1973) (in defining the standards for identifying obscene material that a State may regulate without infringing on the First Amendment, the Court stated that one of the "basic guidelines for the trier of fact must be . . . whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest").

Furthermore, to the extent petitioner contends that the statute is vague as applied to him, his argument must fail.  As the Ohio Court of Appeals pointed out, "[a]side from principles of fundamental decency," which are "ingrained" in our society that the dead are to be treated with respect, reverence and a high degree of decorum, there is evidence in the record to support the inference that petitioner actually knew that official authorization or the permission of next of kin was required for him to proceed with his personal art project, particularly after the autopsy-training video project was canceled due to budgetary concerns.  Such knowledge "should have alerted him" that in the absence of such authorization, his use of morgue corpses as models for his personal photography project could be subject to criminal prosecution either as a misdemeanor or felony offense under Ohio's abuse of corpse statute.  (*See* Doc. 6, Ex. V, p. 13).

Finally, although not considered by the Ohio Court of Appeals in this case, petitioner has not shown that Ohio Rev. Code § 2927.01(B) vests unfettered discretion

---

[16]*See generally* John S. Herbrand, Annotation, *Validity, Construction, and Application of Statutes Making it a Criminal Offense to Mistreat or Wrongfully Dispose of Dead Body,* 81 A.L.R.3d 1071, §2(a) (1977) ("The solemnity and solicitude with which civilized people have attended to the burial of their dead found expression in common law which made disposal of a dead human body in any manner contrary to human decency an offense."); *State v. Vestal,* 611 S.W.2d 819, 821-22 (Tenn. 1981) ("At common law, . . . the substance of the offense was the degrading handling of a human body which offended the public's sense of decency and morals").

with, or places too few constraints on, state officials in enforcing or otherwise applying the law, thereby creating the potential for its arbitrary or discriminatory enforcement.  The statute's application is limited to conduct that would "outrage" the community's reasonable sense of decency and morals.  Moreover, the statute is further limited in application to those persons found to possess the requisite forbidden mental state of "recklessness."  The key elements of a reckless culpable mental and conduct that the community would reasonably find to be "not only wrong, but also outrageous," adequately restricts the discretion of state law enforcement in applying the law to render the risk of arbitrary or discriminatory enforcement of the statute, or any other possible chilling effect on innocent or even negligent conduct by persons in the constitutionally-protected First Amendment area, minimal at best.

In any event, because this Court has upheld the state courts' determination that this case does not involve a violation of petitioner's First Amendment rights, petitioner, whose conduct was clearly proscribed by and fell within the legitimate scope of Ohio Rev. Code § 2927.01(B), cannot claim the law is vague as applied to the conduct of others in situations not before the court.  *See Flipside,* 455 U.S. at 495 & n.7.  Moreover, to prevail on his vagueness challenge, petitioner must demonstrate that Ohio Rev. Code § 2927.01(B) is "impermissibly vague in all of its applications."  *See id.*  He has failed to make such a showing in this case.

Accordingly, in sum, this Court concludes that petitioner is not entitled to habeas corpus relief based on his claim alleged in Ground Four of the petition challenging his gross abuse of corpse convictions upheld by the state courts on the ground that Ohio Rev. Code § 2927.01(B) is unconstitutionally overbroad and vague both on its face and as applied to him.

### E.  Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Five Of The Petition Challenging The Jury Instructions

In Ground Five of the petition, petitioner alleges he was denied due process as a result of the jury instructions that were given at his trial.  (Doc. 1, Addendum).  In his summary judgment motion, petitioner specifically contends that the trial court erred by failing to give instructions requested by defense counsel on "aiding and abetting" and on the terms "authorized by law" and "treat," which are contained in

Ohio's abuse of corpse statute. (Doc. 8, pp. 42-44).[17]

Petitioner presented this claim as an assignment of error on direct appeal. The Ohio Court of Appeals was the last state court to render a reasoned decision addressing the merits of the claim. Without addressing the federal constitutional issue, the court overruled the assignment of error, reasoning in relevant part as follows:

> In the eighth assignment, Condon maintains that the trial court erred in instructing the jury regarding the definitions of (1) "aid and abet," (2) "authorized by law," (3) "treat," and (4) "public office/public official." Because Condon was not charged with aiding and abetting, we do not consider the court's instructions on that matter. It is well established that jury instructions must be reviewed as a whole. . . . A trial court must give instructions that provide a correct, clear and complete statement of the law.... Patterned instructions may aid the trial court in the preparation of the charge to the jury, but jury instructions should be tailored to the facts of the case. . . . The trial court retains discretion on how to conform the jury instructions to the evidence presented at trial....
>
> Condon suggests that the trial court should have better tailored its definition of gross abuse of corpse under R.C. 2927.01 to the facts of this case. First, Condon alleges that the trial court should have elaborated on the portion of the statute relating to "authorized by law." The trial court's instruction was as follows: "Persons authorized by law include a county coroner and designated members of his staff, physicians and surgeons, accredited medical students, embalmers certified to remove human organs by consent of the deceased according to law, and all other persons acting under authority of law."

---

[17]At trial, Tobias's counsel, who was joined by petitioner's counsel, requested that certain instructions be given on aiding and abetting and on the meaning of the terms "authorized by law" and "treat" that are contained in Ohio's abuse of corpse statute. (Doc. 5, Tr. 1345-48, 1355-60). With respect to the term "authorized by law," the trial court rejected defense counsel's proffered instructions on express, implied and apparent authority because they are inapplicable "civil law concepts," and instead opted to provide a verbatim instruction "out of the Ohio Jury Instructions." (*Id.,* Tr. 1357-58). With respect to the term "treat," the trial court similarly chose to follow "the instructions directly out of the Ohio Jury Instructions, Volume 4." (*Id.,* Tr. 1360).

Second, Condon alleges that the trial court should have elaborated on the definition of "treat" under R.C. 2927.01.  Condon[] premises his argument on the fact that taking a picture of a corpse, without evidence of physical alteration, does not constitute an abuse of a corpse.

The court's language relating to "authorized by law" was practically verbatim from the Ohio Jury Instructions. . . .  While the trial court could have defined "other persons acting under authority of law" more definitively, on the whole, the trial court properly instructed the jury. With regard to "treat," we have already held [in addressing a separate assignment of error challenging the sufficiency and weight of the evidence] that the taking of a picture of a corpse for personal use without authorization of law can, given the circumstances, constitute mistreatment of a corpse in violation of R.C. 2927.01(B). Thus, physical alteration is not an element of the crime.  The trial court's instruction relating to "gross abuse of a corpse" fairly and correctly stated the applicable law.

Finally, Condon alleges that, because, in his view, "authorized by law" was not properly defined, the trial court should have instructed the jury about the identity, responsibility, and culpability of public officials who hold public offices.  Having already found that the definition given to the jury by the trial court was proper in light of the facts and circumstances of this case, we do not agree that the proposed definitions were relevant or necessary for the jury to weigh the evidence and to reach a decision relating to Condon's culpability, particularly since Condon was not a public official. . . .

(Doc. 6, Ex. V, pp. 35-37) (state case citations omitted).

As an initial matter, to the extent petitioner claims he is entitled to relief because the trial court committed error or otherwise abused its discretion under state law on the giving of jury instructions, he raises issues of state law only that are not cognizable in this federal habeas corpus proceeding.  A federal court may review a state prisoner's habeas corpus petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris,*

465 U.S. 37, 41 (1984).

It is well-settled under Supreme Court case-law that errors in jury instructions in a state criminal trial generally are not reviewable in a federal habeas corpus proceeding unless they deprived the petitioner of a fundamentally fair trial and due process of law. *See Henderson v. Kibbe,* 431 U.S. 145, 154 (1977); *see also Estelle v. McGuire,* 502 U.S. 62, 72 (1991). Before a federal court may overturn a state conviction based on an error in the jury instructions, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146 (1973). Therefore, the question on federal habeas review of a state conviction is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle,* 502 U.S. at 72 (quoting *Cupp,* 414 U.S. at 147); *see also Henderson,* 431 U.S. at 154. The Supreme Court has clearly established that in answering this question, the instruction must "not be judged in artificial isolation," but rather must be considered in the context of the instructions as a whole and the trial record. *Cupp,* 414 U.S. at 146-47; *see also Estelle,* 502 U.S. at 72. In addition, if the challenged instruction is ambiguous, the inquiry turns on whether a reasonable likelihood exists that the jury applied the instruction in a way that violates the Constitution. *Estelle,* 502 U.S. at 72 (quoting *Boyde v. California,* 494 U.S. 370, 380 (1990)).

In this case, petitioner first challenges the instructions given on "aiding and abetting." As petitioner's counsel pointed out during closing argument at trial, the charges that arguably involved aiding and abetting on petitioner's part were contained in renumbered Counts 3, 4, 5 and 8. (*See* Doc. 5, Tr. 1416). Petitioner was acquitted on Counts 3, 4 and 8, and the charge contained in Count 5 was dismissed in the post-judgment proceedings on petitioner's motion for new trial. Therefore, petitioner is unable to demonstrate that he was prejudiced by the trial court's refusal to give defense counsel's requested instructions on "aiding and abetting."

With respect to petitioner's second claim challenging the instructions on the "authorized by law" element of Ohio's abuse of corpse statute, petitioner has not demonstrated that the trial court even erred in giving the "authorized by law" instruction contained in Ohio's model jury instructions specifically governing criminal abuse of corpse offenses as opposed to defense counsel's requested instructions

applying the civil law concepts of express, implied and apparent authority to the criminal law context. In any event, given the relatively simple factual issue that was clearly laid out by the parties for the jury to resolve as to whether or not petitioner was granted authorization to conduct his personal photography project at the county morgue, the general catch-all provision requiring a verdict of not guilty for "all other persons acting under authority of law" was not so ambiguous as to trigger constitutional concerns. Therefore, in the context of this case, it is not reasonably likely that the jury would have been confused by or otherwise applied the instruction that was given in a way that rendered petitioner's resulting convictions a violation of due process.

For the same reason, the Court rejects petitioner's ancillary contention that the trial court should have given additional clarifying instructions "regarding the identity, responsibility, and culpability of public officials who hold public offices." (*See* Doc. 8, p. 42). As the Ohio Court of Appeals reasonably concluded (*see* Doc. 6, Ex. V, pp. 36-37), because the "authorized by law" definition that was given to the jury was proper and sufficiently clear "in light of the facts and circumstances of this case," the proposed instructions on the terms "public official" and "public office" were neither relevant nor necessary "for the jury to weigh the evidence and to reach a decision regarding [petitioner's] culpability, particularly since [he] was not a public official."

Finally, petitioner has not shown he was denied due process based on the trial court's failure to adopt defense counsel's requested instruction defining the term "treat" as requiring "some physical alteration of the corpse." (*See* Doc. 8, p. 43). The Ohio Court of Appeals determined in addressing petitioner's weight and sufficiency of evidence claim of error on direct appeal that Ohio Rev. Code § 2927.01(B) "clearly proscribes a broad range of conduct," including the unauthorized use of corpses as models for a personal photography project even in the absence of their "physical alteration," as long as such treatment is "so inappropriate and insensitive as to outrage community standards." (Doc. 6, Ex. V, p. 22). This state-law determination is entitled to deference. *See e.g., Gimotty v. Elo,* 40 Fed.Appx. 29, 32 (6th Cir. Apr. 25, 2002) (not published in Federal Reporter) (citing *Davis v. Strack,* 270 F.3d 111, 123 n.4 (2nd Cir. 2001)), *cert. denied,* 537 U.S. 894 (2002); *Johnson v. Rosemeyer,* 117 F.3d 104, 108 (3rd Cir. 1997); *see also Estelle,* 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Warner v. Zent,* 997 F.2d 116, 133 (6th Cir. 1993) (absent a showing of "extreme circumstances where it appears that the [state court's] interpretation of

[state law] is an obvious subterfuge to evade consideration of a federal issue," the federal habeas court is bound by the state court's determination of state law) (quoting *Mullaney v. Wilbur,* 421 U.S. 684, 690-91 (1975)), *cert. denied,* 510 U.S. 1073 (1994).

Accordingly, in sum, this Court concludes that: (1) to the extent petitioner alleges in Ground Five of the petition that the trial court erred under state law in the giving of the jury instructions, his claim is not cognizable in this federal habeas corpus proceeding; and (2) in any event, petitioner has not shown he is entitled to habeas corpus relief based on the merits of any claim alleged in Ground Five that his constitutional rights were violated by the trial court with respect to the jury instructions that were presented at his state trial.

### F. Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Six That His Sentence Amounted To Cruel And Unusual Punishment

In Ground Six of the petition, petitioner asserts that his prison sentence constituted a violation of the Eighth Amendment's Cruel and Unusual Punishment Clause. (Doc. 1, Addendum). Indeed, petitioner goes so far as to contend that "[a]ny prison sentence at all is disproportionate and cruel and unusual in this case." (*Id.*). Petitioner has not, however, set forth any arguments in support of this ground for relief in his summary judgment motion. (*See* Doc. 8).

The Eighth Amendment proscribes the infliction of "cruel and unusual punishments." U.S. Constit. amend. VIII. This provision "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." *Solem v. Helm,* 463 U.S. 277, 284 (1983). In *Solem,* the Court stated:

> Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals. But no penalty is *per se* constitutional. As the Court noted in *Robinson v. California,* 370 U.S. [660,] 667 [(1962)], a single day in prison may be unconstitutional in some circumstances.

*Id.* at 290 (footnote reference omitted, wherein the Court emphasized that it was not acting outside its role by substituting its judgment for that of the sentencing court as to the appropriateness of a particular sentence, but rather was deciding whether the sentence under review was "within constitutional limits" under the Eighth Amendment).

Strict proportionality between a crime and its punishment is not required by the Eighth Amendment. *United States v. Marks,* 209 F.3d 577, 583 (6th Cir.) (citing *Harmelin v. Michigan,* 501 U.S. 957, 959-60 (1991)), *cert. denied,* 531 U.S. 882 (2000). Rather, "only an extreme disparity between crime and sentence offends the Eighth Amendment." *Id.* (citing *United States v. Hopper,* 941 F.2d 419, 422 (6th Cir. 1991)); *see also United States v. Wiley,* 132 Fed.Appx. 635, 643 (6th Cir. May 26, 2005) (not published in Federal Reporter), *cert. denied,* 126 S.Ct. 592, 595 (2005); *cf. United States v. Raad,* 406 F.3d 1322, 1324 (11th Cir.) (when addressing an Eighth Amendment claim, the reviewing court must "make a threshold determination that the sentence imposed is grossly disproportionate to the offense committed"), *cert. denied,* 126 S.Ct. 196 (2005). A sentence that falls within the maximum penalty set by statute "generally does not constitute 'cruel and unusual punishment'" within the meaning of the Eighth Amendment. *Bryant v. Yukins,* 39 Fed.Appx. 121, 123 (6th Cir. Apr. 29, 2002) (not published in Federal Reporter) (quoting *Austin v. Jackson,* 213 F.3d 298, 302 (6th Cir. 2000), in turn quoting *United States v. Organek,* 65 F.3d 60, 62 (6th Cir. 1995)), *cert. denied,* 537 U.S. 925 (2002).

In this case, the Ohio Court of Appeals determined on direct appeal that the trial court did not abuse its discretion in determining that a prison sentence, as opposed to the imposition of "some type of local community-control sanction," was appropriate for petitioner. (*See* Doc. 6, Ex. V, pp. 41-43). The court also upheld the trial court's imposition of consecutive sentences. (*See id.,* pp. 47-48). However, although recognizing that petitioner "may have demonstrated a culpable degree of recklessness, a shameful insensitivity, and callow indifference to the mores of his community and the feelings of others," the court held that the trial court had erred in imposing more than the minimum sentence for each conviction because petitioner's behavior "had not reached the worst-forms level" of abusing a corpse. (*See id.,* pp. 43-45). Therefore, the court reduced petitioner's sentence to the "minimum prison term of six months on all counts." (*Id.,* p. 48). Although that meant a reduction in sentence to an aggregate prison term of eighteen months, petitioner's sentence subsequently was reduced even further to a total of twelve months in prison when Count Five was

dismissed by the trial court.  (*See* Doc. 17).

Upon review of the record, including the Ohio Court of Appeals' thoughtful and extensive consideration on direct appeal of the trial court's sentencing decision, this Court concludes that petitioner has failed to demonstrate that the imposition of consecutive minimum sentences resulting in only a one-year period of incarceration was grossly disproportional to the criminal offenses committed by him.  Because petitioner thus has not shown that his sentence violated the Eighth Amendment's Cruel and Unusual Punishment Clause, he is not entitled to habeas corpus relief based on the claim alleged in Ground Six of the petition.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2.  A certificate of appealability should issue with respect to the claims alleged in Grounds One, Two, Four and Five of the petition, which were addressed on the merits herein,  because petitioner has made a substantial showing that such grounds for relief state "viable claim[s] of the denial of a constitutional right" or are "adequate to deserve encouragement to proceed further;" in contrast, because petitioner has not made such a showing with respect to the claims alleged in Grounds Three and Six of the petition, a certificate of appealability should not issue with respect to the claims alleged in those remaining two grounds.[18]  *See Slack v. McDaniel,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by petitioner to proceed on appeal *in forma*

---

[18]Because this Court's adjudication of the claims alleged in the petition do not involve the denial or dismissal of such claims on procedural grounds, the two-part test enunciated in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000), for determining whether or not to issue a certificate of appealability for procedurally defaulted claims, is inapplicable.

*pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and therefore GRANT petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: 5/25/2006         s/Timothy S. Hogan

    cbc

Timothy S. Hogan
United States Magistrate Judge

J:\BRYANCC\2006 habeas orders\03-897condon.waiv-prosmisc-1A-4A-VagueOverbr-instruct-8A.wpd

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

―――――――――――――――――

Thomas Condon,
     Petitioner,

                                 Case No. 1:03cv897

        v.                         (Weber, S.J.; Hogan, M.J.)

Jeffrey Wolfe,
     Respondent.

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action.  Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s).  Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474  U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).